## RODMAN v. RICHFIELD OIL CO. OF CALIFORNIA et al.

### No. 7106.

Circuit Court of Appeals, Ninth Circuit.

June 13, 1933.

Rehearing Denied July 24, 1933.

Keyes & Erskine and Olds & Olds, all of San Francisco, Cal., and Meserve, Mumper, Hughes & Robertson, of Los Angeles, Cal., for appellant.

Gibson, Dunn & Crutcher, H. F. Prince, Homer D. Crotty, and Robert F. Schwarz, all of Los Angeles, Cal., for appellees Richfield Oil Co. and McDuffie.

William J. De Martini, of San Francisco, Cal., for appellee Richfield Oil Co.

H. W. O'Melveny, Walter K. Tuller, and Louis W. Myers, all of Los Angeles, Cal. (O'Melveny, Tuller & Myers, of Los Angeles, Cal., of counsel), for appellee Security First Nat. Bank.

Alexander MacDonald and Robert H. Edwards, Jr., both of Los Angeles, Cal. (Bauer, MacDonald, Schultheis & Pettit, of Los Angeles, Cal., of counsel), for Bondholders' Committee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

SAWTELLE, Circuit Judge.

The Richfield Oil Company of California, a Delaware corporation, hereinafter referred to as "the company," was at the date of the issuance of the bonds and the deed of trust hereinafter mentioned, and at the date of the commencement of the action in which the appellant sought to intervene, engaged in the production, refining, and marketing of petroleum and its products.

Prior to July 19, 1929, the company duly authorized the creation of a bonded indebtedness of $75,000,000. On June 19, 1929, the company executed a trust indenture, bearing date of May 1, 1929, securing the bond issue. At the time of the filing of the petition for leave to file a foreclosure complaint, by the Security First National Bank of Los Angeles, trustee under the indenture, which petition is hereinafter referred to, there were outstanding bonds aggregating $24,981,000. The pertinent provisions of the indenture follow:

Article XII, section 3:

"If one or more of the events of default shall happen, the Trustee may, and upon the written request of the holders of twenty-five per cent (25%) in amount of the bonds and coupons secured hereby and then outstanding, and upon being furnished reasonable indemnity therefor, shall, by notice in writing delivered to the Company, declare the principal of all bonds secured hereby then outstanding to be due and payable immediately, and, upon any such declaration, the same shall become and be immediately due and payable, anything in this indenture or in said bonds contained to the contrary notwithstanding."

Article XII, section 4: "If one or more of the events of default shall happen, the Trustee in its discretion may, and upon the written request of twenty-five per cent (25%) in amount of the bonds and coupons secured hereby then outstanding, and upon being furnished reasonable security therefore, shall proceed to protect or enforce its right or rights of the bondholders under this indenture by a suit in equity or action at law, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the foreclosure of this indenture, or for the enforcement of any other appropriate legal or equitable remedy as the Trustee shall deem most effectual in support of any of its rights or duties hereunder; and upon instituting such proceedings or in order to take possession as hereinbefore provided, the Trustee shall be entitled to the appointment of a receiver of the trust estate and to the sale of the trust estate as an entirety, if the court in its discretion shall so order."

Article XIII, section 4: "The Trustee shall be under no obligation to recognize any person, firm or corporation, as the holder of any bonds issued hereunder, or do or refrain from doing any act pursuant to the request or demand of any person, firm or corporation, professing or claiming to be such holder, until such holder shall produce the bond or bonds and deposit the same with the Trustee, and furnish from time to time reasonable indemnity against all costs, attorney's fees, expenses, judgments and other obligations and liabilities of any kind which the Trustee may expend, incur or be entitled to receive by complying with such request or demand. * * * *"

Article XIV, section 2: "No holder of any bond or coupon secured hereby shall have any right to institute any suit, action or proceeding at law or in equity for the foreclosure of this indenture or for the execution of any trust or power hereof or for the appointment of a receiver or for any other remedy under or upon this indenture, unless such holder previously shall have given to the Trustee written notice of an event of default; and unless also the holders of twenty-five per cent (25%) in amount of the bonds and coupons secured hereby then outstanding shall have made written request upon the Trustee and shall have afforded to it a reasonable opportunity either to proceed to exercise the powers hereinbefore granted, or to institute such action, suit or proceeding in its own name, and such notification and request hereby are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts of this indenture, or for the appointment of a receiver, or for any other remedy hereunder; it being understood, intended and hereby provided that no one or more holders of bonds or coupons secured hereby shall have any right in any manner whatever, by his or their action, to affect, disturb or prejudice the lien of this indenture, or to enforce any right hereunder, except in the manner herein provided, and that all proceedings hereunder shall be instituted, had and maintained in the manner herein provided, for the equal benefit of all holders of such outstanding bonds and coupons."

On January 15, 1931, in the court below the Republic Supply Company of California,

a general unsecured creditor of the company, commenced the present action, in which intervention was sought, for the appointment of a receiver in equity, and for other relief.

On May 1, 1931, the company made default in the semiannual interest payments due on the bonds on that date.

On the same day, the company consented to the granting of the relief ·sought and an order was made appointing Wm. C. McDuffie receiver of the company.

On May 25, 1932, the appellant filed his verified petition for leave to intervene to foreclose the mortgage and trust indenture. A copy of the proposed "complaint in intervention" was attached to the petition for leave to intervene.

In the proposed complaint in intervention for foreclosure, the appellant set forth, among others, the following allegations:

1. That the company had made default in the payment of the installments of interest on the bonds on May 1, 1931, November 1, 1931, and May 1, 1932.

2. That the intervener was informed and believed that on or about February 14, 1931, a "purported bondholders' protective committee was attempted to be formed and organized by" certain persons named in the complaint; that one of the members of the committee was, at the time of the issuance of the bonds and the appointment of the receiver, one of the directors of the company, and that the other members of the committee were connected with firms or corporations that underwrote the bond issue and that by reason thereof the committee had available to it a list of the bondholders; that the committee ·circularized the bondholders, requesting them to enter a contract, known as a deposit agreement, with the committee whereby the contracting bondholders constituted the committee their attorney in fact to act on their behalf respecting the bonds; that holders ·of less than 20 per cent. of the outstanding bonds entered into the agreement, while the holders of more than 80· per cent. refused to allow the committee to represent them; · that the committee had become "practically functus officio," etc.

3. That the intervener was the owner of ten bonds of the company, of the par value of $1,000 each.

4. That the intervener believed that the bonds were owned by more than 7,000 persons, scattered throughout the United States, and therefore "powerless to concert any action to enforce and protect their rights under the said indenture."

5. "That demand has been made upon the trustee to declare the principal of all the bonds secured by the said indenture to be due and payable immediately, and to commence an action to foreclose the said indenture, and to take all other proper and appropriate action and means to protect and enforce the rights of the persons owning bonds secured by the said indenture, but the said trustee refused and still does refuse to comply with the said demands."

6. "That this intervener is informed and believes and therefore avers that the said trustee is now and ever since the said receiver was appointed has been an unsecured creditor of the said company in a sum exceeding the sum of $1,500,000.00. That the interest of the bondholders under the said indenture as secured creditors of the said company is conflicting with the interest of the unsecured creditors, including the trustee, who is one of the largest thereof. That it is claimed by the said receiver and by the said trustee and by the other unsecured creditors that there are certain assets of the said company which are not embraced within, or covered by the said indenture, and are not applicable to the payments of said bonds, and are applicable to the payment of the unsecured creditors, of which the said trustee is one. That in this respect and generally the interest of the said trustee is adverse to the interests of the said bondholders, and that in the nature of things the said trustee cannot in the above entitled proceedings disinterestedly represent the bondholders' interests, or protect such interests."

7. That the intervener "files this complaint on behalf of himself and on behalf of and for the benefit of all other owners and holders of said bonds who may choose to come in and avail themselves of the benefits of this litigation and share the expense thereof."

8. That, under the terms of the indenture, in the event of a sale thereunder, the proceeds shall first be applied to the expense of foreclosure and sale, including a reasonable attorney's fee, and then to the pro rata payment of principal and interest, etc.; and that it has become necessary for the intervener to employ counsel, and that "the reasonable value" of the services of his counsel is secured by the indenture, "and should be paid from the proceeds of any sale made pursuant thereto."

9. Wherefore, the intervener prayed that it be adjudged that there was then owing by the company the principal of the bonds in the· face amount of $25,000,000, with interest; that the property covered by the indenture,

be sold by a commissioner in the usual manner of the sale of real and personal property upon execution, etc.

The lower court issued an order to show cause why the appellant's petition for leave to intervene should not be granted, the order being served upon the company's attorneys. On June 6, 1932, the order to show cause was called for hearing, and in pursuance of a written stipulation, the hearing was continued to June 27, 1932.

On June 21, 1932, the trustee filed its petition for leave to file a bill of complaint to foreclose the trust indenture. On the same day, an order to show cause on the trustee's petition was issued and thereafter served upon the respective attorneys for the company, the Republic Supply Company, the receiver for the Richfield Company, and the appellant herein. On that day, furthermore, the trustee and a bondholders' committee made separate motions to appear specially in the proceedings, in opposition to the appellant's motion to intervene; no notice of the motions being served upon the appellant or his attorneys. The motions were granted. The order granting the motion of the committee was served upon the attorneys for the appellant and others.

Pursuant to the two orders granted above, the trustee and the bondholders' committee each filed a written opposition and objections to the appellant's petition to intervene.

Attached to the trustee's written opposition was an affidavit of L. H. Roseberry, a vice president of the trustee bank, and manager of its trust department, which set forth, among others, the following statements:

1. The fact that the trustee was an unsecured creditor of the company was known at the time of the execution of the indenture and at the time of the sale and issuance of the bonds.

2. After the appointment of the receiver and the creation of the bondholders' committee, referred to above, the trustee was informed that there was due by the company to the state of California approximately $1,000,-000 for gasoline tax covering sales for the quarter ending December 31, 1930. The receiver claimed he had no funds available for the payment of the tax, and that unless it was paid on or before February 14, 1931, a penalty of 10 per cent. would accrue and the license of the company possibly would be revoked.

3. The trustee gave careful consideration to the question as to what action should be taken in view of the receivership to protect the interests of the bondholders and particularly with reference to the filing of a claim on their behalf. On March 19, 1931, the trustee instructed counsel to prepare and file a claim in the receivership proceedings for the bank as trustee on behalf of the holders of the outstanding bonds, and this was done.

4. After long and complicated negotiations, in which the trustee and the bondholders' committee took an important part, being "in almost daily consultation," the Cities Service Company deposited with the trustee $782,423.78, which was paid to the state of California on May 15, 1931, in satisfaction of the gasoline tax then due.

5. During May, 1931, Stanley Arndt, an attorney of Los Angeles, represented to the trustee that his father was the owner of $4,000 in par value of the company's bonds, and gave notice in writing of certain defaults then existing in the payment of interest that became due on May 1, and asserted that the company was in default in other particulars. By reason of such defaults, demand was made upon the trustee by Arndt, in a letter received by the trustee, to foreclose under the indenture and to declare the principal of all bonds secured thereby immediately due and payable. To this the trustee replied that to initiate a foreclosure proceeding at that time and accelerate the maturity of all the outstanding bonds would have resulted in the possible discontinuance of the company's operations, thus depreciating the value of the property. In the affiant's opinion, the trustee's attitude was further justified by reason of the fact that at that time it was believed that the Cities Service Company and others were willing to submit a proposal for the company's reorganization, which would result in its continuance and ultimately redound to the benefit of the bondholders.

6. The developments during the succeeding months demonstrated in a measure the correctness of this opinion, for the reason that the receiver, during that period, was able to continue the business in operation and to repay, from such operation, in full the $782,-423.78 advanced by Cities Service Company, as hereinbefore recited.

7. In May, 1931, the trustee received by mail a letter from L. Heuler, M. D., purporting to be a bondholder. [Reference to Dr. Heuler's letter, a copy of which was annexed to Roseberry's affidavit, discloses that the former promised to deposit his bonds with the trustee if the latter took foreclosure proceedings against the company or to remove McDuffie, adding: "If not, I will proceed with

foreclosure proceedings myself. Now you can save your time by not telling me that I must have 50% of the bonds to foreclose according to the indenture of the bonds. When I get through you can hang the indenture up on one of the Richfield beacon lights, where it would be some use to aviators, but I certainly am going to show you what a minority security holder can do in a court room. However, I would rather have you handle the entire matter, together with other bondholders."]

8. Prior to June 15, 1932, no demand or request had ever been made upon the trustee by any bondholder, or by any one claiming to be a bondholder, either that the trustee declare the principal payable, or that it institute foreclosure proceedings, other than in Arndt's and Dr. Heuler's letters. No such demand had ever been received by the trustee from the appellant.

9. During May, 1932, the affiant and various members of the trustee's trust committee became increasingly of the opinion that the time was approaching for some such action by the trustee, and on or about May 23, 1932, the affiant, in consultation with the trustee's counsel, stated his opinion to such effect and requested counsel to undertake the preparation of the necessary documents.

Filed with the written opposition and objections of the bondholders' committee was an affidavit by Alexander MacDonald, counsel for the bondholders' committee, which corroborated and amplified a number of the statements contained in Roseberry's affidavit. Among others, MacDonald's affidavit contained the following statements:

1. At the time of the filing of MacDonald's affidavit, there had been deposited with the bondholders' committee, bonds aggregating the principal sum of approximately $5,874,500. The committee was named on January 23, 1931.

2. On or about March 31, 1931, the affiant caused to be filed with the receiver on account of the committee and pursuant to its instructions, a claim on behalf of all the deposited bonds that might thereafter be deposited with the committee.

3. The committee instructed the affiant to state that "it is their opinion, and it is his opinion, that at no time has the trustee functioned in a way detrimental to the bondholders, but to the contrary, that the trustee has at all times been keenly alive to its duties to the bondholders and that its actions have been governed solely by what was, in its opinion, the best interests of the bondholders."

In this connection, it may be added that the company, the receiver, and the bondholders' committee have filed briefs supporting the trustee's "preferential right to foreclose," and opposing the appellant's claim to intervene for the purpose of foreclosing.

The petition of the appellant for leave to intervene came up for hearing on June 27, 1932, before the court below. Counsel for the appellant moved the court for an order granting the petition, and offered in support thereof the complaint and answer in the original suit, the order appointing the receiver, and the appellant's verified petition for leave to intervene and foreclose. Counsel for the trustee offered the above-mentioned written objections and Roseberry's affidavit, and counsel for the bondholders' committee likewise offered its objections, and MacDonald's affidavit, also referred to above. Counsel for the appellant objected to the offer of the written oppositions and to the admissibility of either of the affidavits. The objection was overruled.

Appellant's petition was submitted, and the lower court proceeded immediately to hear the trustee's petition for leave to intervene and foreclose.

On July 27, 1932, the court rendered a memorandum opinion on each of the submitted petitions, making orders granting the trustee leave to intervene and foreclose, and denying the appellant's petition for the same purpose. Republic Supply. Co. v. Richfield Oil Co. (D. C.) 4 F. Supp. 153.

From those orders the present appeal was taken.

A motion to dismiss the appeal has been filed before this court by the trustee. In view of the importance of the issues, however, we prefer to decide the case upon the merits.

We have set out the proceedings and pleadings in the court below with some degree of fullness for the reason that it should be made clear what the court below had before it at the time it made the orders of which the appellant complains.

We wish particularly to emphasize that at the time the court heard the appellant's petition for leave to intervene, it had before it the trustee's petition to the same end.

It will also be seen that there was no compliance by the appellant with the provisions in the indenture requiring that, before the holder of a bond could foreclose, such holder shall give the trustee written notice of an event of default, and requiring that holders of 25 per cent. in amount of the bonds shall

have made written request upon the trustee to foreclose in its own name. Neither was there compliance with the provision requiring that, upon being requested to foreclose, by 25 per cent., in amount, of the bondholders, the trustee shall be "furnished reasonable indemnity therefor."

In Chicago, D. & Vincennes Railroad Company v. Fosdick, 106 U. S. 47, 76, 77, 78, 27 L. Ed. 47, the mortgage contained the provision that "after the principal of the bonds has been declared by the trustees to have become due, by reason of the default therein described, and the mortgagor notified thereof, the trustees, 'upon the written request of the holders of a majority of the said bonds then outstanding, shall proceed to collect both principal and interest * * * by foreclosure and sale,' " etc. Of such a provision, the Supreme Court said:

"It is an agreement which the parties were at liberty to make. There is nothing in it illegal or contrary to public policy. And while it is in the nature of a forfeiture, it is one against which, when it has taken place according to the fair meaning of the parties, courts of equity will not relieve. It was so held in Noyes v. Clark, 7 Paige (N. Y.) 179 [32 Am. Dec. 620]; Noonan v. Lee, 2 Black, 499 [17 L. Ed. 278]; Olcott v. Bynum, 17 Wall. 44 [21 L. Ed. 570].

"The stipulation, nevertheless, is in the nature of a penalty, and may be regarded as stricti juris, to be construed fairly and reasonably, according to the meaning of the parties, but leaning, if need be, in any case of ambiguity, in favor of the debtor. And the construction, in the present instance at least, which favors him, does not discriminate against the bondholders as a class, but rather between the interests of the whole number, represented by the trustees and controlled by a majority, and those of a single creditor, or a minority, associated in the like case, pursuing their remedy as individuals. For while, as we have seen, one or any number of bondholders may prosecute a bill to foreclose the mortgage, upon default as to payment of a single coupon, or the trustees may intervene on behalf of all for the same purpose, because the failure to pay a single instalment of interest is made a breach of the condition of the mortgage; yet it is apparent that one purpose at least of the clause in question was to protect the bondholders as a class against the views of individuals and combinations of individuals, being a minority, pursuing separate interests.

"In declaring the principal sum due before the date fixed by the credit, upon a default in the payment of interest, the trustee is acting for the whole number of bondholders, and the provision that subjects his action in enforcing the stipulation to the wishes of a majority is meant, as we think, for the protection of the class. Many cases may be mentioned to illustrate the importance in their interests of such a control, rather than to put it in the power of one or a minority to require all to accept what the majority might consider to be a premature and less valuable satisfaction for their existing security. The larger number might think it to their advantage even to defer the collection of their overdue interest, much less not to anticipate the payment of the principal, even when the security was ample to meet both; for they might esteem the ultimate investment higher than present payment. While they could not and ought not to prevent others, even a single individual, from exacting the promptest payment of what is due and may be important as current income, by legal process, they may nevertheless rightfully object to an anticipation of payment that may, in their opinion, prove to be a sacrifice. And this becomes especially important when the present value of the security is insufficient to prepay the incumbrance, but contains the solid promise of future indemnity as an investment. It is that interest we think, that dictated the clause in question, and can be satisfied only by the construction which secures to the majority of the bondholders the right to veto the proceeding of the trustees."

While it is true that, in the instant case, the trustee was indeed given the discretion to foreclose, nevertheless the reasoning of the Supreme Court in the Chicago, D. Vincennes R. Co. Case is helpful in our present task of construing the effect of the provisions here involved.

In Allan v. Moline Plow Co., Inc. (C. C. A. 8) 14 F.(2d) 912, 913, 917, the court had before it a "25 per cent." provision in several respects closely similar to the one at bar, save that in that case the security and indemnity must previously have been tendered to the trustee by the very bondholder who sought to institute suit for collection. In that case the court said:

"It was clearly the purpose of the trust agreement to provide that no action should be taken by a note holder that did not have the approval of at least 25 per cent. in amount of the holders of the notes.

"We therefore conclude that the provisions of the trust agreement prohibited plaintiff from maintaining this suit until demand

had been made upon the trustee by at least 25 per cent. in amount of the note holders to prosecute the suit and the trustee had refused so to do. It follows that the very contract upon which plaintiff's cause of action is predicated provides that he shall not maintain this suit until the performance of a condition precedent which has not yet been performed."

See, also, in general as to the right of majority bondholders not to be governed by the wishes of the minority, First National Bank v. Shedd, 121 U. S. 74, 86, 87, 7 S. Ct. 807, 30 L. Ed. 877. ·

In a well-considered case, Seibert v. Minneapolis & St. L. Ry. Co. et al., 52 Minn. 148, 53 N. W. 1134, 1136, 20 L. R. A. 535, 38 Am. St. Rep. 530, the Supreme Court of Minnesota used the following language as to requirements in indentures such as that which we are now considering: "Again, the trustee, as mortgagee, representing the interests of all the bondholders as beneficiaries, is the proper party to institute foreclosure proceedings, but, if he unreasonably neglects or refuses to discharge his duty in the premises, doubtless any bondholder may bring an action to enforce the security for the common benefit. [Chicago, D. & V.] Railroad Co. v. Fosdick, 106 U. S. 68, 27 L. Ed. 47. Why may not the mortgage in the common interest stipulate the conditions under which this right may be exercised by the bondholders, and, in order to avoid the risk of rash or arbitrary proceedings which might result in great injury to the security, provide that no such proceedings should be instituted by an individual bondholder except upon the refusal of the trustee to obey the requisition of a reasonable number of the bondholders? It is not the intention or effect of such conditions or stipulations to divest the bondholders of their right to judicial remedies, or to oust the courts of their jurisdiction; it is merely the imposition of certain conditions upon themselves in respect to the exercise of that right. And this distinction is well recognized by the courts. [Cases cited.] The provisions of this mortgage are not, we think, unreasonable or invalid. It is suggested that the trustees in the several mortgages have no right to raise this question, but we think the provisions in question were intended for the benefit of the bondholders as well as the mortgagor, and therefore the trustees, who, we may assume, represent the majority of the bondholders, are entitled to object to the relief sought by the defendant, on the ground that it is contrary to the stipulations in the mortgage above referred to. It is also urged that the Central Trust Company, which is trustee in several mortgages, cannot properly act for the interests of the various bondholders which are conflicting. However this may be, we fail to see how that fact can affect the question raised by the demurrer, because, if the provisions of the mortgage we have been considering are valid, the intervener has no standing in court to have the mortgages foreclosed."

■ The appellant's allegation in his proposed bill of complaint in intervention, to the effect that "demand has been made upon the trustee," is not, of course, a sufficient pleading under the terms of the indenture, which require that certain specific conditions, already fully discussed herein, be complied with before an individual bondholder may bring suit for foreclosure.

■ Nor does the record establish that proper notice or demand in fact was given to the trustee. The attempted demands or notices by Arndt and Dr. Heuler were not in compliance with the provision of the indenture as to the trustee's right not to recognize any person as a bondholder without the latter's depositing the bonds with the trustee. See Article XIII, section 4, already set forth.

■ On the question of lack of demand, the appellant insists that the law "does not require a useless act." But the fact that attempted demands for foreclosure were made *a year before* by *two* alleged bondholders, is by no means a compliance with the specific regulations of the indenture, where the bondholder's suit is brought a year after such purported notice or demand. The receivership picture might well have changed in the interim.

The appellant contends, however, that "such provisions in the trust deed are invalid and of no effect, and are not binding upon the bondholders where it appears that the trustee has, after default, refused upon the request of any one of the bondholders to bring such foreclosure action, or has neglected to bring such foreclosure action, or that the trustee stands in, or occupies a position antagonistic and hostile to the interest of the bondholders, or has or represents interests adverse to those of the bondholders."

■ We have already quoted Supreme Court decisions on the injustice of permitting one or a few bondholders from circumventing the wishes of the majority, by instituting proceedings for foreclosure when the majority are in favor of deferring such suit. If the indenture gives a minority a right thus to act —as does the indenture in the instant case— the provisions of that document must be

strictly adhered to; for, as we have seen, a stipulation for foreclosure proceedings, even at the will of the *majority*, are "in the nature of a penalty." A fortiori, a stipulation giving a *minority* the right to authorize foreclosure may, in the language of the Vincennes Case, be regarded as "stricti juris."

We advance, then, to what is perhaps the appellant's main contention, namely, that the provisions of the indenture are "invalid" when the trustee is shown to have or to represent interests "adverse," "hostile," or "antagonistic" to the cestui que trust. In such a situation, the appellant argues, the bondholder's right to intervene is "absolute," if the property involved is in custodia legis.

The mere fact of the trustee's "interest" in the subject-matter of the foreclosure is not sufficient to make such trustee incompetent to serve. Neither is the fact that the trustee is a general creditor. There must be some allegation of bad faith or of fraud. The appellant's proposed bill of complaint contains no such allegation.

This entire question was lucidly expounded in Shaw v. Railroad Company, 100 U. S. 605, 613, 25 L. Ed. 757, in which the court said:

"The bare fact that some of the trustees were holders of bonds secured by their trust is not sufficient of itself to make them incompetent to consent to such a decree as was rendered. From the whole case it is apparent that from the beginning their conduct was governed by the wishes of a very large majority of bondholders. If there was anywhere the slightest evidence of fraud or unfaithfulness, their conduct would be carefully scrutinized. The acts of trustees when personally interested should always be open and fair. Slight circumstances will sometimes be considered sufficient proof of wrong to justify setting aside what has been done. But when every thing is honestly done, and the courts are satisfied that the rights of others have not been prejudiced to the advantage of the trustee, the simple fact of interest is not sufficient to justify the withholding of a confirmation of his acts.

"Here the name of Gookin, one of the trustees, appears in the list of bondholders appointing the committee to make the purchase at the sale as the holder of two hundred thousand dollars of the bonds. Associated with him in the list were others representing near six millions of dollars. His name openly appeared on the paper when the court was asked to confirm the sale on the conditions agreed to. Certainly this is not sufficient to defeat the plan to which he and his associates gave their consent. *Atkins, another trustee, was a creditor of the company,* whose debt came within the provision made in the decree for payment by the new corporation. All this was fully explained to the court when the modification of the decree in this particular was asked for, and since no claim can now be paid except with the approval of the court after notice to the appellants, we see no reason why what has already been done is not sufficient for the protection of all concerned." (Italics our own.)

In an effort to explain away the Shaw decision, the appellant, in his reply brief, asserts that in the Shaw Case "the only fact tending to show adverse interest on the part of the trustees was that some of the trustees were holders of bonds secured by the trust." The italicized portion of the excerpt quoted above discloses that the appellant is in error in that statement.

We have examined the cases quoted by the appellant, and find that, on the law and the facts, they are neither applicable nor controlling here.

And in connection with the appellant's claim as to the trustee's alleged neglect, we find that in McPherson v. Commercial Building & Securities Co., 206 Iowa, 562, 218 N. W. 306, 308, the Supreme Court of Iowa used the following language: "If the trustee be derelict or disqualified, he [the bondholder] has his remedy by a direct proceeding against him in a court of equity, which upon proper showing may remove and substitute. But the plaintiff may not in a mere action upon his alleged cause of action collaterally attack the capacity or qualification of a receiver or trustee. The plaintiff can have no more right of control of the securities than any other bondholder. No other bondholder has consented that the plaintiff may assume the role of trustee of such securities."

Since the appellant does not have the absolute right to intervene, his petition necessarily falls within the category of those the granting of which lies in the sound discretion of the court. Indeed, as we shall presently see, the general rule is that the granting of a petition to intervene is discretionary.

Equity Rule 37 (28 USCA § 723) provides, in part, as follows: "Anyone claiming an interest in the litigation *may* at any time be permitted to assert his right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding." (Italics our own.)

In Credits Commutation Co. v. United

States, 177 U. S. 311, 315, 316, 20 S. Ct. 636, 638, 44 L. Ed. 782, cited by the appellant himself, the court said:

"The question was well considered by the circuit court of appeals [91 F. 570], and we quote and adopt its statement, as follows:

" 'When such action is taken, that is to say, when leave to intervene in an equity case is asked and refused, the rule, so far as we are aware, is well settled that the order thus made denying leave to intervene is not regarded as a final determination of the merits of the claim on which the intervention is based, but leaves the petitioner at full liberty to assert his rights in any other appropriate form of proceeding. Such an order not only lacks the finality which is necessary to support an appeal, but it is usually said of it that it cannot be reviewed, because it merely involves an exercise of the discretionary powers of the trial court. * * * It is doubtless true that cases may arise where the denial of the right of a third party to intervene therein would be a practical denial of certain relief to which the intervener is fairly entitled, and which he can only obtain by an intervention. Cases of this sort are those where there is a fund in court undergoing administration to which a third party asserts some right which will be lost in the event that he is not allowed to intervene before the fund is dissipated. In such cases an order denying leave to intervene is not discretionary with the chancellor, and will generally furnish the basis for an appeal, since it finally disposes of the intervener's claim by denying him all right to relief. The cases at bar, however, are not of that character.' "

Construing Equity Rule 37, the late Judge Gilbert of this court, in O'Connell v. Pacific Gas & Electric Co., 19 F.(2d) 460, 461, said: "The language of the rule indicates that the right to intervene so referred to is not absolute, and that the circumstances may be such as to justify its denial in the exercise of the court's discretion. Here neither fraud, bad faith, bad judgment, nor conspiracy is shown on the part of the municipal authorities, who represent all of the gas consumers. The application for leave to intervene rests upon no statute or other authority than the federal equity rules."

See, also, Merriam v. Bryan (C. C. A. 9) 36 F.(2d) 578, 579; Buel v. Farmers' Loan & Trust Co. (C. C. A. 6) 104 F. 839, 842, 843, certiorari denied 180 U. S. 639, 21 S. Ct. 921, 45 L. Ed. 711; Richfield Oil Co. v. Western Machinery Co. (C. C. A. 9) 279 F. 852, 855,

certiorari denied 260 U. S. 723, 43 S. Ct. 13, 67 L. Ed. 481; Lupfer v. Carlton, Governor, etc. (C. C. A.) 64 F.(2d) 272; Fink v. Bay Shore Terminal Co. (C. C. A. 4) 144 F. 837, 838, affirmed 203 U. S. 577, 27 S. Ct. 777, 51 L. Ed. 325.

■ Finally, the appellant contends that "he was the first to bring such a proceeding and at the time he started, the trustee had done nothing." Again, he argues that: "Even though it should be decided as of the day it is heard, at the time of the actual hearing on June 27th, there was no proceeding pending for the protection of the bondholders. There was a petition of the bank pending, to be heard after appellant's petition, and which was heard after appellant's petition. But if appellant's petition is not to be decided as of the date of the filing, but as of the date of the hearing, the same holds true, as far as the bank's petition is concerned, and so it cannot be considered that at the time appellant's petition was heard there was any complaint in intervention on file on behalf of the bank to protect the bondholders, and therefore it must be considered that both at the time of the filing, and at the time of the hearing of appellant's petition the bondholders were unrepresented in the case, and accordingly appellant had the absolute right to intervene."

Such a technical argument, based upon the theory that the race is to the swift, is completely answered in the McPherson Case, supra: "In a controversy between the bondholders, as to the trusteeship, to which of them could the control be awarded? * * * This race is not to the swift. The respective rights and liens of all bondholders are already fixed. No advantage can be gained by being first at the tape. The trustee must proceed in accord with the obligations assumed by him under the deed of trust, unless he be removed by the court in a proper proceeding."

■ Accordingly, the granting of the appellant's petition to intervene was a matter within the discretion of the trial court. Since the matter lay in the court's discretion, we do not think that the learned judge below erred in admitting the affidavits of Roseberry and MacDonald; nor do we believe that there was abuse of discretion in denying the appellant's petition to intervene.

We therefore hold that there was no error in the orders of the lower court denying the appellant's petition and granting the trustee bank's petition to intervene.

Judgment affirmed.