## CARSON et al. v. LONG–BELL LUMBER CORPORATION et al.*
### No. 9909.

Circuit Court of Appeals, Eighth Circuit.
Oct. 15, 1934.

Walter H. Saunders, of St. Louis, Mo. (John S. Leahy, of St. Louis, Mo., and John T. Barker, David M. Proctor, Phineas Rosenberg, Floyd E. Jacobs, Mitchell J. Henderson, and Charles P. Woodbury, all of Kansas City, Mo., on the brief), for appellants.

Jesse Andrews and R. R. Brewster, both of Kansas City, Mo. (C. E. Lombardi, David E. McLean, and Baker, Botts, Andrews & Wharton, all of Kansas City, Mo., on the brief), for appellees.

Before STONE and GARDNER, Circuit Judges, and JOYCE, District Judge.

GARDNER, Circuit Judge.

This is a suit in equity brought by appellants, with certain others who have not joined in this appeal, as the owners of certain mortgage bonds amounting in the aggregate to $16,100, against the Long-Bell Lumber Corporation, a Maryland corporation, the Long-Bell Lumber Company, a Missouri corporation, and the Long-Bell Lumber Sales Corporation, a Delaware corporation, various corporate subsidiaries of the Long-Bell Lumber Company, and the officers and directors of all of the corporations. The bill which was four times amended is somewhat involved, and it is difficult to express in a few words the nature and the purpose of the suit. A statement of the substance of the relief demanded may assist in a better understanding of the nature and extent of the issues.

The prayer of the complaint comprises more than four pages of the printed record, and may be summarized as follows: (1) That a receiver be forthwith appointed of all the property of every nature, wheresoever situated, held, and controlled by the defendant companies, with power to take possession, to conduct the business of the companies, to bring suit for the collection and possession of all properties, and with other usual powers of receivers in such cases; that the officers, managers, superintendents, agents, and employees of the defendant companies and of their subsidiaries be required forthwith to deliver up to the receiver possession of all the properties of the companies, including all books, papers, files, and documents in relation to the business of the defendant companies; (2) that the court administer the property rights and business belonging to the defendant companies and their subsidiaries, and adjudicate, enforce, and adjust the rights, liens, equities, and claims of all creditors of the defendant companies, including the plaintiff, and marshal the assets of the defendant companies for the benefit of their creditors; (3)

that all creditors, stockholders of the defendant companies and their subsidiaries, including railroads, be enjoined from instituting or prosecuting, or continuing the prosecution, of any actions, suits, or proceedings at law, against the defendant companies, or their subsidiaries; (4) that writ of injunction issue, enjoining and restraining defendant companies and their officers, agents, and employees, together with their subsidiaries, from interfering with, transferring, or disposing of any of the property of the defendant companies, or their subsidiaries; (5) that the officers and directors of the defendant companies be suspended, and upon final hearing removed, and that they be required to account for any and all assets and property of the companies, or their subsidiaries, which they have wasted or dissipated to the prejudice of the stockholders or creditors, both secured and unsecured, and that decree be entered adjudging such officers to pay the defendant companies, or their receiver, such sums as may be ascertained to be due from them by such accounting; (6) that the receiver appointed be authorized and directed to make full and thorough investigation of all the acts and conducts of the officers and directors of the defendant companies, and their subsidiaries, in respect to the control, conduct, management, and disposition of the business and property of the defendant companies and their subsidiaries for at least five years past, with a view of determining whether such officers and directors have negligently or wrongfully conducted the business of the defendant companies, or have wasted or diverted from the defendant companies property due or belonging to them; (7) that the court fix a time within which all creditors or claimants shall file their claims against the defendant companies; that notice be given by the receiver for the presentation of such claims, and that a master be appointed to pass upon them; (8) that the court order the properties of the defendant companies to be sold, in whole or in part, upon such manner, terms, and conditions as the court shall deem just and equitable, making suitable provision for the preservation of the equities, rights, and priorities of the claims and liens of the creditors; (9) that upon final hearing the receiver may be made permanent; (10) that the court grant the complainant process directed to the defendants; (11) "that the transfer of all the free, unencumbered and unpledged assets of said The Long-Bell Lumber Company to the said The Long-Bell Lumber Sales Corporation be annulled, rescinded and set aside and all of the said assets be restored to the said The Long-Bell Lumber Company."

The lower court dismissed the suit on its merits for want of equity, and from that decree the present appeal is prosecuted.

The Long-Bell Lumber Company was incorporated in 1884. It was considered the largest manufacturer of lumber under one name in the world, and had had a very successful and prosperous history until 1922. The Long-Bell Lumber Corporation owns 98.94 per cent. of the stock of the Long-Bell Lumber Company, which in turn, through itself or subsidiaries, controls the remaining corporations through which its ramified business of lumbering and allied industries and related activities have been carried on. Beginning with 1926, and continuing until 1932, there was a falling off in the business of the defendant companies. In the ordinary conduct of its business, the Long-Bell Lumber Company from time to time borrowed large sums of money from various banks throughout the country, and it had come to rely upon these banks for its reasonable requirements of operating funds. Prior to 1929, at the beginning of each year, it had arranged for lines of credit with these banks which were some of the leading banks of the principal cities of the country. In 1930, the officers of the lumber company made their usual annual visits to the banks through which they had been doing business, to obtain assurance that credit would again be extended. One of these banks which had previously given a line of credit declined so to do for 1930. Another bank conditioned its offer to reaffirm its line of credit for $1,000,000, on condition that all other banks, except the one that already had withdrawn, would reaffirm their lines of credit. At the Chase National Bank in New York City they were advised that the note of the lumber company for $1,000,000, due May 10, 1930, would have to be liquidated, and that bank refused to reaffirm the line of credit for 1930. One of the officers of the bank advised that the Long-Bell Lumber Company should take steps to strengthen its credit position with the banks. To accomplish this, the officer advised that the Long-Bell Lumber Company should put the banks in a more secure position by placing in one corporation all the stock of which should be owned by the lumber company, certain of the lumber company's free and unincumbered assets of a liquid character, including cash, accounts receivable, inventories, and other property, and then by securing a written agreement from the banks that they would stand together and extend given lines of credit to the newly organized corporation, supported by the guaranty of the lumber company, for a stipulated length of time, so that the banks and each of them would be definitely bound and could not "run out" as one of the banks had already done. The plan was taken up with the other banks, but nothing was done about the matter until August, 1930. The lumber company's debt to the banks was then $5,400,000.

On October 31, 1930, the books of the lumber company showed assets in excess of liabilities of $48,000,000. It had cash on hand of $2,500,000; current assets in excess of $13,700,000 against current liabilities of approximately $7,800,000; total assets exceeding $109,000,000. It had assets of $30,000,000 book value, not covered by any lien. It was about to close the sale of a power house at Longview, Wash., for $3,366,000 cash, which sale was in fact closed November 1, 1930; a sale of a logging or lumber railway in Washington for $4,265,000, which transaction was consummated November 2, 1931, for cash. At that time, October, 1930, it was not anticipated that the lumber company would be unable to meet its obligations.

In August, 1930, it was decided to form a sales corporation, and to enter into an agreement with the banks such as had been suggested, and pursuant to this plan, in December, 1930, title to certain property of the Long-Bell Lumber Company was transferred to the Long-Bell Lumber Sales Corporation, which had in the meantime been incorporated, in exchange for stock in the Long-Bell Lumber Sales Corporation and the execution of a Syndicate Loan Agreement. The Long-Bell Lumber Sales Corporation received from the Long-Bell Lumber Company property of the value of over $26,000,000. The Syndicate Loan Agreement, executed December 9, 1930, provided that the banks, which were parties to it, up to July 1, 1931, would make loans to the Long-Bell Lumber Sales Corporation in certain respective maximum amounts aggregating $8,100,000, $6,000,000 of which being immediately available, and the remainder to be advanced by the banks with the approval of a committee made up of representatives of the banks. The Long-Bell Lumber Sales Corporation, under this agreement, was authorized at any time in its discretion to loan of its funds as much as $500,000 to the Long-Bell Lumber Company. It was also provided that the sales corporation and the lumber company would enter into a lease, whereby the lumber company would lease to the sales corporation its sawmills at a rental equivalent to taxes and insurance thereon, the sales corporation to keep all property in good condition and repair, giving the sales corporation the right to cut any timber the lumber company had the right to cut by paying for the timber the

lumber company's book value. The sales corporation agreed to assume the debt of $5,400,000 due from the lumber company to the banks, and other debts amounting in all to $7,000,000. After this agreement was executed, the sales corporation borrowed from the banks $5,400,000 and paid that debt, and the notes of the sales corporation to the banks were indorsed by the lumber company. During the first period of operation under the first syndicate loan agreement, the Long-Bell Lumber Sales Corporation operated at a loss and owed the Long-Bell Lumber Company approximately $480,000 for timber cut for which it had not paid.

When the first syndicate loan agreement expired on June 30, 1931, a second similar agreement was executed to expire December 31, 1931, but a change was made in the agreement to the effect that the sales corporation should pay, from its profits only, all taxes and insurance on the plants as rental and the book value of timber cut and removed.

It seems here desirable to retrace our steps for the purpose of noting the condition of the bonded indebtedness of the Long-Bell Lumber Company. On July 1, 1922, the Long-Bell Lumber Company executed its first mortgage under which first mortgage bonds in the aggregate amount of $30,000,000 were authorized. This mortgage covered lands and timber in certain states, lumber manufacturing plants, a mill site, and stock of the Weed Lumber Company, a California lumber manufacturing company. First mortgage series A bonds to the amount of $10,000,000 were issued. By supplemental indenture, dated April 1, 1923, under which series B bonds were issued, there were made subject to the first mortgage additional timber lands, the lumber manufacturing plant of the Weed Lumber Company, and shares of the capital stock of the Longview Suburban Company. By supplemental indenture, dated July 1, 1926, under which series C bonds were issued, still further timber lands were placed under the mortgage.

The mortgage contains provision that the mortgagor will pay to the trustee, on or before the 1st day of the months of January, April, July, and October of each year, beginning with the 1st day of October, 1922, and until all first mortgage bonds are paid, an amount in cash equal to the sum of $6 for each thousand feet of timber in the state of Louisiana, or the state of Texas, and subject to the lien of the mortgage, cut or sold during the three months ending the 15th of the month preceding such payment date, and an amount in cash equal to the sum of $3 for each one thousand feet of timber in the state of California, or the state of Oregon, subject to the lien of the mortgage, cut or sold during a similar period, and as to timber in other states, subject to the lien of the mortgage, similar payments. The mortgage appoints an appraiser and provides that assets shall remain subject to the lien of the mortgage at a value not less than twice their appraised value. Commencing July 1, 1925, provision is made for the retirement of a certain amount of bonds annually.

The maximum amount of bonds issued was $28,000,000. On November 1, 1930, there were outstanding of these $23,253,400, and at the time of trial $20,206,500. At the time of trial there was due the sinking fund for lumber cut $255,400. Against this there had been deposited with the trustees canceled bonds in the amount of $225,500. None of the mortgaged property was transferred by the lumber company to the sales corporation.

In selling the bonds, circulars were issued, on the recitals of which the appellants claim to have relied, and they urge that these representations gave rise to an equitable lien in their favor on all the assets of the Long-Bell Lumber Company. One of the circulars recites:

"These Bonds will be secured by a first mortgage on unencumbered standing timber having a value, as independently appraised, equal to at least 100% of the face amount of the outstanding bonds, and will be further secured by a mortgage on plants, mills and other property having a value at least sufficient to make the aggregate security under the mortgage not less than 200% of the par amount of outstanding bonds, both of which ratios the Company covenants to maintain at all times. * * *

"The Consolidated balance sheet of The Long-Bell Lumber Company and subsidiaries as certified by independent auditors at date May 31, 1922, and after giving effect to the present financing, discloses net tangible assets, after deducting all liabilities except these Bonds, of $70,581,368.95 and Net Quick Assets of $13,259,178.21 or $7,058.13 and $1,325.91, respectively, per $1,000 Bond."

In these circulars, statements were made as to net earnings over a period of years, return of capital, and the size of the company. A history of the company and its growth was contained in the circulars, and provisions to be contained in the mortgage were set out. A balance sheet showing all net tangible assets, as well as a statement that the business was a complete industrial unit, were included. The other circulars were similar in many respects,

and what has been said as to the one may be taken as typical of the others.

In January, 1932, one Hutson, owner of $4,500 of bonds, commenced a suit, which was consolidated with the present suit. Appellants own $16,100 of such bonds. Hutson has not appealed.

Appellants' bonds do not mature until April 1, 1943, and they do not seek foreclosure of any lien. They assert rights, both as secured and unsecured creditors. The record indicates that the suit was tried with painstaking care by the lower court, and special findings of fact and conclusions of law were entered, on the basis of which the suit was dismissed on its merits.

The court found that the Long-Bell Lumber Company was not insolvent when the bills were filed, nor at the time of trial, though it was financially embarrassed as a result of the depression which had affected it and all other similar industries; that its present inability to pay certain of its obligations was solely caused by the depression, and was not the result of any mismanagement or fraud on the part of the officers and directors of the company; that the business of the defendant companies had been efficiently and economically managed, and that to meet the situation resulting from the depression drastic reductions in operating expenses had been effected; that the men in charge of the business of the Long-Bell Lumber Company were those who had developed it from its beginning; that their efficiency, capacity, high sense of honor, and integrity in their business dealings have been amply shown; that approximately 74 per cent. of the bonds of the Long-Bell Lumber Company have been deposited with a bondholders' protective committee, which is opposed to the appointment of a receiver.

That the appellants have made no showing warranting the appointment of a receiver seems too clear to require the citation of authorities. Central West Public Service Co. v. Craig (C. C. A. 8) 70 F.(2d) 427, and authorities there cited. In fact, counsel now contend that their application for the appointment of a receiver was the merest incident to the relief which they have sought. It appears, however, that the lower court was of the view that the suit was one "primarily seeking a receivership." In the memorandum overruling motion for rehearing, the court among other things said: "In the two opinions filed I have stated the grounds on which I have thought a receivership for The Long-Bell Lumber Company should be denied. In the preparation of those opinions I interpreted the cases as primarily seeking a receivership. Upon that was placed all the emphasis in the pleadings, briefs and oral argument prior to the entry of the decree. But in the petitions for rehearing and in the written and oral argument supporting them, the matter of receivership is subordinated and characterized as merely incidental to other relief now said to be what primarily is sought by plaintiffs."

In this court great stress is placed upon the transfer of certain unincumbered property by the lumber company to the sales corporation. It is urged that the transfer of this property in the circumstances here presented was a fraud in law, regardless of the intention of the parties. Considering the contentions of appellants as unsecured creditors, and assuming, as we must, that the transaction was in good faith, appellants have failed to make out a prima facie case of fraudulent conveyance. The good-faith transfer of property to a corporation, even though organized for that purpose, in exchange for its capital stock, is not per se fraudulent, at least unless such transfer has the effect of hindering and delaying creditors. The stock stands in place of the property and is subject to execution. The Long-Bell Lumber Company, through the ownership of the stock of the sales corporation, still owned the property transferred. Gardner v. Haines, 19 S. D. 514, 104 N. W. 244; Shumacker v. Davidson, 116 Iowa, 569, 87 N. W. 441; Plaut v. Billings-Drew Co., 127 Mich. 11, 86 N. W. 399; Scripps v. Crawford, 123 Mich. 173, 81 N. W. 1098; Sayers v. Texas Land & Mortg. Co., 78 Tex. 244, 14 S. W. 578; Bristol Bank & Tr. Co. v. Jonesboro Banking & Tr. Co., 101 Tenn. 545, 48 S. W. 228; Skinner v. Southern Gro. Co., 174 Ala. 359, 56 So. 916; Scheck v. Bowne, 113 N. J. Eq. 51, 166 A. 189; In re Braus (C. C. A. 2) 248 F. 55; Brill v. W. B. Foshay Co. (C. C. A. 8) 65 F.(2d) 420.

There is a finding that there was no fraud on the part of the officers or directors, and other findings of the court exclude any idea of fraud. An examination of the record convinces that any other finding would be contrary to the evidence. But, quite aside from the bona fides of this transfer, the appellants are as unsecured creditors in no position to attack it because the property transferred was not covered by their mortgage, and they have acquired no lien of any kind or character upon it. It is elementary that a simple contract creditor, without having reduced his claim to judgment, and without having exhausted his remedy at law, or having acquired some lien upon the property transferred, cannot maintain a suit to set

aside such a transfer. Scott v. Neely, 140 U. S. 106, 11 S. Ct. 712, 35 L. Ed. 358; Swan Land & Cattle Co. v. Frank, 148 U. S. 603, 13 S. Ct. 691, 37 L. Ed. 577; Pierce v. United States, 255 U. S. 398, 41 S. Ct. 365, 65 L. Ed. 697; Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. Ed. 738; Cates v. Allen, 149 U. S. 451. 13 S. Ct. 883, 37 L. Ed. 804; People's Savings Bank v. Bates, 120 U. S. 556, 7 S. Ct. 679, 30 L. Ed. 754; Morrow Shoe Mfg. Co. v. New England Shoe Co. (C. C. A. 7) 57 F. 685, 24 L. R. A. 417.

Prior to the entry of deficiency judgment, one whose debt is secured by mortgage cannot maintain a suit to set aside an alleged fraudulent transfer. Perkins v. Bundy, 42 Idaho, 560, 247 P. 751. But it is urged that appellants acquired an equitable lien because of the circulars issued describing the bonds. While we are of the view that no equitable lien, express or implied, was created by such circulars (Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865; Pierce v. Nat. Bank of Commerce (C. C. A. 8) 268 F. 487; Jackman v. Newbold (C. C. A. 8) 28 F. (2d) 107, 62 A. L. R. 729; In re Clark Realty Co. (C. C. A. 7) 234 F. 576), in any event, appellants, subsequent thereto, took a mortgage on specific property, and hence cannot now claim an equitable lien on other property. The bondholders must look to the mortgage as actually delivered as containing their contract security. Van Weel v. Winston, 115 U. S. 228, 6 S. Ct. 22, 29 L. Ed. 384.

We turn, therefore, to the transaction embodied in the second so-called syndicate agreement, which affects the rights of appellants as secured creditors. It is urged that the appellants' rights under the mortgage have been infringed and impaired by this agreement and the acts of the parties pursuant thereto.

An essential part of the security back of these bonds consists of tracts of standing timber and plants to manufacture lumber and timber products, and the question presented is whether waste has been committed. Under the original provisions of the mortgage, the mortgagor was, under stated limitations, permitted to cut the timber. Under the second syndicate agreement, the sales company was permitted to cut this timber, paying for it, if at all, out of the profits of the business. The contract provided that the sales company "shall not be otherwise obligated to pay." So far as a security for the bonds is concerned, the only possible substitute for the timber when cut must come from payments under the contracts from the sales company to the lumber company. Without such payments, the security pledged is obviously being depleted to the extent that the timber is cut and not paid for. The mortgage permits the cutting of timber, and provides that the mortgagor shall make report to the trustees and make payments into the sinking fund at a stipulated rate.

The lumber company made no default under the mortgage until February 1, 1932, at which time it defaulted in the payment of bond interest, and the following April 1st and July 1st it made default in the sinking fund payments. It was only after these defaults had been made that the cutting of the timber was unwarranted. The total value of the timber cut up to the time of the trial, for which the required payment into the sinking fund had not been made, was $255,400. As a partial offset to this default, canceled bonds of the face amount of $225,500 were deposited with the trustees, so that the net waste could not reasonably exceed $29,900.

On this phase of the case, the court found as a fact, among other things, that, while the Long-Bell Lumber Sales Corporation had operated at a loss, due to its inability to sell lumber which it had manufactured from the timber of the Long-Bell Lumber Company for enough to pay the cost of cutting, manufacturing, and selling it, yet "the value of the property covered by the first mortgage and the supplemental indentures, however, has not thereby been reduced nor the security behind the bonds in any wise lessened, since the alternative to the arrangements required by the Syndicate Loan Agreements would be the cessation of manufacture and the discontinuance of the Long-Bell business as a going concern. Such a cessation of manufacture and discontinuance of active operations would greatly depreciate the actual value of the properties covered by the mortgage and so seriously disadvantage the bondholders of the Long-Bell Lumber Company."

It is the contention of appellants that by this modification in the contract the sales company acquired the right to cut such timber as it saw fit, and the lumber company might never receive any compensation therefor, nor even secure the amount of the taxes and interest upon the leased plants, unless the sales company should make a profit; that to the extent at least, that the sales company operated without making a profit, the banks secured payment on their obligations from a sale of the security which was back of appellants' bonds; that, while the banks were unsecured creditors of the lumber company at the time this plan was devised, they were through this contract, nevertheless, reaping the fruits of the security back of the bonds.

In our view of the case, the merits of this contention are not properly before us, because of the following provision of the mortgage: "No holder of any First Mortgage Bond or coupon shall have any right to institute any suit, action or proceeding in equity or at law for the foreclosure of this Indenture, or for the execution of any trust hereunder, or for the appointment of a receiver, or for any other remedy, hereunder, unless such holder previously shall have given to the Trustees written notice that some event of default specified in such notice has happened, nor unless also the holders of twenty-five per cent in amount of the First Mortgage Bonds then outstanding shall have made written request upon the Trustees, and shall have afforded the Trustees a reasonable opportunity either to proceed to exercise the powers hereinbefore granted, or to institute such action, suit or proceeding in their own names; ·nor unless, also, they shall have offered to the Trustees adequate security and indemnity against the costs, expenses and liabilities to be incurred therein or thereby."

Under this provision of the mortgage, appellants, as secured creditors through the ownership of first mortgage bonds had no right to institute this suit. The above provision is comprehensive and sweeping, and the bonds upon their face state that "the nature and extent of the security and the rights of the holders of the bonds issued, and the terms and conditions upon which the bonds are issued and secured" were set forth in the mortgage, and that "all rights of action upon this bond, except as otherwise provided in said mortgage, are vested in the trustees." The above-quoted section of the mortgage makes it clear that no one or more holders of the bonds should have any right whatever to bring an action to enforce rights under the mortgage, except in the manner therein provided. As has already been observed, the provisions of the mortgage are incorporated in each bond by reference, and hence are binding upon all the bondholders. These provisions are binding on appellants. Central West Public Service Co. v. Craig (C. C. A. 8) 70 F.(2d) 427; Allan v. Moline Plow Co. (C. C. A. 8) 14 F. (2d) 912; Home Mortg. Co. v. Ramsey (C. C. A. 4) 49 F.(2d) 738; Rodman v. Richfield Oil Co. (C. C. A. 9) 66 F.(2d) 244. The total amount of appellants' bonds is $16,100, so that they could not comply with the conditions precedent to the filing of this suit.

It is clear that a suit for the relief here sought, in the circumstances disclosed, can only be maintained by the trustees.

It is, however, urged by appellants that in their capacity as unsecured creditors under sections 4959, 4960, and 4961 of the Revised Statutes of Missouri, 1929 (Mo. St. Ann. §§ 4959–4961, pp. 2270–2272) they have a right to maintain this suit because it is claimed their property rights as general creditors have been impaired by the directors "by violation of their duties or abuse of their powers as directors." If the statutes referred to can be said to add anything to the rights of general creditors, they do not create any new substantive rights. It is the settled law that state laws do not constitute a rule of decision in federal courts of equity. Neither can the remedial right to proceed in a federal equity suit be enlarged by a state statute. Brill v. W. B. Foshay Co. (C. C. A. 8) 65 F.(2d) 420; Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763; Cates v. Allen, 149 U. S. 451, 13 S. Ct. 883, 37 L. Ed. 804; Scott v. Neely, 140 U. S. 106, 11 S. Ct. 712, 35 L. Ed. 358.

We have considered the other contentions of appellants, but, in view of the conclusions already reached, any further discussion of the issues would seem to serve no useful purpose. The judgment appealed from is therefore affirmed.

STONE, Circuit Judge.

I concur in the result of affirmance on the sole ground that these appellants are disqualified, by the provisions of the mortgage protecting their bonds, from bringing this action. The bonds upon their face stated that "the nature and extent of the security and the rights of the holders of the bonds issued, and the terms and conditions upon which the bonds are issued and secured" were set forth in the mortgage and that "all rights of action upon this Bond, except as otherwise provided in said Mortgage, are vested in the Trustees." Section 15 of article 8 of the mortgage provided that no one or more holders of the bonds should have any right whatever to bring an action to affect or enforce rights under the mortgage except in the manner therein provided, and the manner therein provided required that the trustees should act, upon impulse from bondholders, only when 25 per cent. in amount of the outstanding bonds had made written request under certain conditions and situations as to notice set forth therein. It seems obvious that these conditions in the bond and the mortgage control the situation here. I have not found in the petition or any of the pleadings upon which the case was tried any legal reason for voidance or noncompliance with this condition. It seems to me that upon this special defense the issue made by the pleading was whether there

was a provision of that sort in the bond and mortgage binding upon these appellants. If they wish to admit such existence and avoid its effect, they should have amended the petition to that effect. Not having done so, the issue thereon was one merely of denial. The evidence establishes the existence of such conditions without dispute, and therefore the denial is ineffective on the facts. In this situation, it seems to me the appellants must lose upon this issue. This issue goes to the root of their right to proceed under their bond contract and leaves them out of court.