### FUTRALL v. TRIPLETT et al.
No. 10611.

Circuit Court of Appeals, Eighth Circuit.
July 27, 1936.

862

Harry T. Wooldridge, of Pine Bluff, Ark., for appellant.

A. F. Triplett, of Pine Bluff, Ark. (Coleman & Gantt, of Pine Bluff, Ark., on the brief), for appellees.

Before WOODROUGH and THOMAS, Circuit Judges, and DEWEY, District Judge.

WOODROUGH, Circuit Judge.

This suit in equity was brought by the receiver of the National Bank of Arkansas to compel the defendants to specifically perform a certain contract of date January 2, 1920, by paying to a trustee named in the contract the sum of $100,000 either as the unpaid purchase price of certain lands or as liquidated damages specified in the contract. The contract evidenced a conditional sale by the Security Trust Company of Lexington, Ky., trustee of lands in Lonoke and Jefferson counties, Ark., to C. H. Triplett, W. C. Hudson, and R. Carnahan, and the agreement of the three purchasers to pay the trustee $590,000 therefor, and it included a clause providing for the payment of the sum of $100,000 as liquidated damages in case the purchasers "shall default in the payment of any sum of principal, interest or taxes for a period of thirty days after the same becomes due."

At the time the suit was brought R. Carnahan, one of the three purchasers of the land, had died insolvent. His administrator was made a party defendant but his estate was wholly insolvent, having debts amounting to $750,000 "probated" against it and no payment of any dividend anticipated. W. C. Hudson, another of the purchasers, was made a party defendant, but was also shown to be insolvent. The other purchaser, C. H. Triplett, was not made a party defendant. The defendants not shown to be insolvent are the sons and daughter of C. H. Triplett. None of them signed or was a party to the contract sought to be enforced against them, but the allegations of the petition were that the said sons and daughter of C. H. Triplett (naming them) had "by proper instrument in writing acquired all the rights and privileges and assumed all of the obligations of C. H. Triplett under and pursuant to the contracts executed on January 2, 1920." The object of the suit, as disclosed by the

petition, was to hold the sons and daughter of C. H. Triplett upon their alleged assumption of the obligations of their father and not otherwise.

On the trial of the case the plaintiff failed to prove that the sons and daughter of C. H. Triplett had assumed the obligations undertaken by their father in his contract of January 2, 1920. They had acquired from their father all of his interests in the lands purchased by him and his associates as evidenced by his certain deed of conveyance to F. H. Triplett as trustee for all the children and by their conduct in making one of the payments on the contract after such conveyance. Nowhere in the deed is there a clause by the terms of which the grantee assumes and agrees to pay the purchase price. It is well settled that the mere assignment of a land contract by the purchaser does not of itself impose upon the assignee a personal obligation to the vendor to perform the contract. Urban v. Phy (C.C.A.9) 24 F.(2d) 494; Felker v. Rice, 110 Ark. 70, 161 S.W. 162; Fretwell v. Nix, 172 Ark. 230, 288 S.W. 8, 9; Nix v. Kirkland, 173 Ark. 291, 292 S.W. 664; Huffman v. Fudge, 124 Ark. 208, 213, 187 S.W. 644; United Brick & Tile Co. v. McKissick (C.C.A.) 51 F. (2d) 67; Dahlhjelm Garages v. Mercantile Ins. Co., 149 Wash. 184, 270 P. 434. Neither does the making of a payment after the assignment create such a responsibility. Tarpey v. Curran, 67 Cal.App. 575, 228 P. 62, 67; Adron v. Evans, 52 S.D. 292, 217 N.W. 397, 59 A.L.R. 947; Gafford v. Twitty, 154 Ga. 682, 115 S.E. 105; Metropolitan Nat. Bank v. St. Louis Dispatch Co., 149 U.S. 436, 447, 13 S.Ct. 944, 37 L.Ed. 799; Meyer v. Droegemueller, 165 Minn. 245, 206 N.W. 391.

The trial court properly so found and the receiver's suit, as presented in his petition against the sons and daughter of C. H. Triplett, entirely failed upon that ground.

But the defendant W. C. Hudson, who had joined with C. H. Triplett as one of the purchasers of the Arkansas lands and had obligated himself to the payment of the purchase price and the other requirements of the contract of January 2, 1920, pleaded by way of a cross-bill against the sons and daughter of C. H. Triplett (naming them) that they had, on May 27, 1930, entered into a written contract with him, the said W. C. Hudson, whereby they had, for valuable consideration moving from him to them, "expressly assumed the payment of all obligations of whatsoever nature which were at that time due or which might become due under said two contracts within a period of six months" from May 27, 1930. W. C. Hudson accordingly prayed in his cross-bill that he have judgment over against the sons and daughter of C. H. Triplett for any amount that might be decreed in favor of the bank's receiver in his suit against him (Hudson). The sons and daughter of C. H. Triplett joined issue with the defendant W. C. Hudson on the cross-bill, and, among other things, they denied that the plaintiff receiver of the bank was entitled to the relief prayed for against the defendant W. C. Hudson. They alleged the insolvency of Hudson and pleaded that, unless they were granted opportunity of making defense on behalf of W. C. Hudson, "no judgment over" against them should be rendered on behalf of said W. C. Hudson on any judgment against him. They were allowed to make defense for W. C. Hudson.

On the trial of the case the proof was made almost entirely by a written agreed statement of facts which was signed by the sons and daughter of C. H. Triplett and by the plaintiff receiver through their respective attorneys and was not signed by W. C. Hudson. This was treated in the trial court as proof upon the issues raised by the petition of the plaintiff receiver against W. C. Hudson as well as upon the issues raised by the cross-bill of W. C. Hudson against the sons and daughter of C. H. Triplett. All such issues were decided by the trial court in favor of the Triplett defendants and against the receiver of the bank. Elaborate findings were made and a decree in favor of the sons and daughter of C. H. Triplett was entered, from which the receiver of the bank appeals.

We proceed to consider whether a case was made out in favor of the receiver of the bank and against the defendant W. C. Hudson. The admitted facts found by the trial court, which we deem controlling on that question, are as follows:

Until the year 1915, R. Carnahan was a resident of Kentucky and was engaged, among other things, in the lumber business. At that time the Kentark Land & Timber Company was the owner of approximately 23,500 acres of land in Lonoke and Jefferson counties, Ark. R. Carnahan

was the president of the company, a Kentucky corporation having a number of stockholders, practically all of whom were residents of Kentucky. In 1914, the timber from these lands was sold to Brown Bros. & Carnahan, which was a partnership with R. Carnahan as one of the partners, the National Lumber & Creosoting Company, and others. There was a sawmill and a short line of logging railroad at Allport, in Lonoke county, Ark., of which Brown Bros. & Carnahan were given the use until they should have finished their operation of cutting and sawing timber bought from the Kentark Land & Timber Company. About that time the Kentark Land & Timber Company made contracts with various persons, by the terms of which approximately 12,000 acres of the real estate was sold to various purchasers on deferred installments for the purchase price, as represented by the respective contracts for the purchase thereof. R. Carnahan was actively in charge of the operations of the Kentark Land & Timber Company as well as the operations of Brown Bros. & Carnahan. At the end of 1915 he moved to Arkansas and with C. H. Triplett and W. C. Hudson purchased the assets of the bank of Pine Bluff, Ark., and organized the National Bank of Arkansas, Pine Bluff, Ark., of which C. H. Triplett was president, R. Carnahan was vice president, and W. C. Hudson was cashier. From that time until the time of his death he resided in Arkansas, where his primary occupation was the lumber business. In 1925, the Triplitts sold all of their stock in the National Bank of Arkansas, C. H. Triplett resigned as president of the bank, and W. C. Hudson thereupon became president with R. Carnahan continuing as vice president. In the latter part of 1919, negotiations were opened for the sale by the Kentark Land & Timber Company to R. Carnahan, W. C. Hudson, and C. H. Triplett of the lands of the Kentark Land & Timber Company, subject to the timber contracts and installment purchase contracts above mentioned. The plan was conceived of putting the title to this real estate in the Security Trust Company of Lexington, Ky., as trustee which would issue to the stockholders of the Kentark Land & Timber Company certificates of beneficial ownership in proportion to the amount of stock held by each. Deeds were executed accordingly by the Kentark Land & Timber Company on the 8th day of September, 1919, conveying undivided interests in said lands to each of its stockholders who in turn executed their deeds conveying the lands to the Security Trust Company of Lexington, Ky., which, in turn, executed and issued to the stockholders of Kentark Land & Timber Company certificates in the following form:

"Negotiable Trust Receipt

"This Certifies that ———— is the owner of ———— parts of a Trust Estate consisting of certain lands lying and situate in the Counties of Lonoke and Jefferson, State of Arkansas, formerly owned by Kentark Land and Timber Company, and personal property and standing timber, which property (except the timber) has been contracted to be sold by the undersigned Trustee to C. H. Triplett, W. C. Hudson and R. Carnahan by contract dated January 2nd, 1920, which is referred to and made a part hereof as fully as if copied at length herein, and is entitled to the payments and benefits set forth in an agreement dated January 2nd, 1920, between Roger H. Smith and others, designated as 'Owners', and Security Trust Company, designated as 'Title Holder', which is also referred to and made a part hereof as if copied at length herein.

"This certificate is transferable on records to be kept by the undersigned for the purpose of transfer, by the owner in person or by duly appointed attorney, only upon presentation and surrender thereof, properly endorsed, to the undersigned, and the transferee shall be entitled to all the rights and privileges and be subject to all the obligations of the original owner with respect to said Trust Estate from and after the date of said transfer.

"In witness whereof this certificate has been executed by a duly authorized Officer of the Trustee in Lexington, Kentucky, on the ———— day of ————.

"Security Trust Company
"By J. Robt. Smith, Asst. Secretary-Treasurer."

The contemplated purchase price of such property was $590,000, but since the Kentark Land & Timber Company was indebted to the National Bank of Arkansas, Pine Bluff, Ark., and the National Bank of Kentucky, Louisville, Ky., in the sum of $40,000, which was to be paid by the purchasers as a part of the purchase money, the trust estate was treated as composed of the remainder of the purchase money, in the sum of $550,000, so that the trust es-

tate was divided into 550,000 shares and such certificates were issued as evidencing the ownership of a certain number of 550,000 shares of the trust estate.

On the 2d day of January, 1920, the Security Trust Company of Lexington, Ky., as trustee, entered into a written contract with all of the respective stockholders of the Kentark Land & Timber Company relating to the sale of certain lands to Carnahan, Hudson, and Triplett and to the issuance of certificates showing the rights and interests of the various certificate holders with reference to such trust and participating in the proceeds of the said sale. This contract recites that the owners (the stockholders of the Kentark Land & Timber Company) have, by their several deeds, conveyed to the title holder (the Security Trust Company) their respective undivided interests in the lands in question, and that the lands have been contracted to be sold to Triplett, Carnahan, and Hudson, and it was agreed:

(1) The title holder shall issue to each owner, who shall have heretofore conveyed or shall hereafter convey his interest in said lands to the title holder, a certificate showing the undivided interest of such owner in the proceeds of the sale, which certificate shall be negotiable and may be transferred by the owner thereof only by attorney or in person on the books of the title holder when properly indorsed and surrendered to the title holder. The title holder shall keep a record of the names and post office addresses of the owners of such certificates, and shall pay to the owners and holders thereof, from time to time as received by it, all payments made to or collected by it on account of the purchase price of the lands contracted to be sold, and from other sources in pro rata parts, after first deducting any and all costs and expenses incurred or for which it may reasonably anticipate it may become liable before any further payment is due, and its own reasonable fees and charges.

(2) In case the contract of sale made between the title holder and Messrs. Triplett, Carnahan, and Hudson, hereinbefore referred to, shall not be complied with by said purchasers wholly or in part, the title holder is authorized and directed to dispose of the remainder of the property in its hands in such manner as may be directed by the majority in interest of the owners, or their representatives and assigns, and to distribute the proceeds after first deducting its costs, expenses, and charges as aforesaid, among the owners, their representatives, or assigns, pro rata; or in default of any such direction, then according to the principles of equity in such cases obtaining.

(3) The title holder shall not be liable to the owners in any case arising under this agreement except for its willful misconduct or gross negligence, and shall be entitled to a reasonable fee for its services and for counsel if it employs counsel, and all costs and expenses incurred by it or for which it may become liable; and shall be protected in any event by acting upon the written direction and authority of the majority in interest of the owners as shown by the records kept by it.

A copy of the contract with Carnahan, Hudson, and Triplett for the sale of said lands was attached to and made a part of said contract between said Security Trust Company, as trustee, and the stockholders of the Kentark Land & Timber Company.

On the same day, namely the 2d day of January, 1920, a written contract was entered into between the Security Trust Company of Lexington, Ky., as trustee and holder of the legal title to said lands, and R. Carnahan, W. C. Hudson, and C. H. Triplett, by the terms of which the Security Trust Company agreed to sell, and Triplett, Hudson, and Carnahan agreed to buy, the described lands for the purchase price of $590,000, of which $40,000 was to be paid by payment of the debt of the Kentark Land & Timber Company to the National Bank of Arkansas, Pine Bluff, Ark., and the National Bank of Kentucky, Louisville, Ky. And the sum of $550,000 was to be paid $25,000 on June 30, 1920, and $25,000 every six months thereafter until the sum of $550,000 should have been paid to such trustee. Such contract being subject to the sales contracts previously entered into by the Kentark Land & Timber Company on approximately 12,000 acres of said lands, and being further subject to timber rights conveyed by timber deeds of Kentark Land & Timber Company, and subject to the right of Brown Bros. & Carnahan to the use of such sawmill and logging railroad at Allport, until they should have finished their operations of cutting and sawing the timber they bought from the Kentark Land & Timber Company.

As originally issued by the said trustee, the certificates were all held by the vari-

ous stockholders of the Kentark Land & Timber Company. Since such time, however, such certificates have changed hands so that at the present time the plaintiff is the holder of certificates numbered 26 to 31, inclusive, evidencing 214,800 of the 550,000 trust shares owned by Carnahan being pledged to secure a note now owned by the plaintiff, and the defendants, constituting the firm of the C. H. Triplett Company, are the owners and holders of the remaining 335,200 of such trust shares.

Until the making of such contract to purchase, neither C. H. Triplett nor any of the defendants composing the firm of the C. H. Triplett Company had any interest whatsoever either in said lands or the timber thereon. Both the Kentark Land & Timber Company and R. Carnahan were engaged in the lumber business on the land involved in this suit and other lands.

· The lands embraced by the contract to purchase aggregate approximately 25,000 acres, practically none of which was in cultivation at the time of such contract to purchase. Until such time as said lands are put in cultivation they are chiefly valuable for timber thereon. The contract to purchase excepted the timber; the same having prior to the date of the contract been sold to various partnerships or corporations in which R. Carnahan was the principal shareholder.

All payments due on said contract were paid to the trustee as the same became due, and were distributed by the trustee to the various certificate holders until July 1, 1929, at which time default was made in the $25,000 principal payment due on said date. No payments have been made since that date, and there is now past due under the terms of such contract the total principal sum of $100,000.

On February 25, 1922, R. Carnahan was indebted to the Security Trust Company of Lexington, Ky., in the sum of $30,-000, as evidence of which he executed to such Security Trust Company his note· in such sum, due and payable one year after date, and bearing interest at the rate of 6 per cent. per annum from date until paid. At such time Carnahan was also the owner of certificates numbered 26 to 31, inclusive, representing 214,800 shares of such trust estate, of which certificates he transferred and assigned to the said Security Trust Company, as collateral security for the payment of such note, 100,000 shares at the time when said note was executed.

Later Carnahan also pledged as security for said note the remaining 114,800 shares owned by him. Certain payments of principal and interest were made by Carnahan on said note and on the 29th day of November, 1929, the National Bank of Arkansas, of Pine Bluff, Ark., agreed to purchase said note upon which there was due on said date the sum of $28,672.95 principal, and $1,274.77 interest, and such note was, on the 28th day of April, 1930, transferred and assigned to said National Bank of Arkansas, and on said date the said certificates were delivered to the National Bank of Arkansas as the collateral securing such note. The National Bank of Arkansas is now the owner and holder of said note and the holder of such trust certificates as security for the payment thereof, and no payments have been made upon said note since the same was acquired by the National Bank of Arkansas.

Title is still in the trustee to approximately 16,422 acres of the property conveyed by the contract to purchase.

Until after default was made on July 1, 1929, in the payments due under the contract of purchase the Triplett defendants did not own a majority in interest of the certificates representing the right to participate in the trust estate; that afterwards in the month of July, 1929 (during the 30 days' grace period contemplated by the contract), said Triplett defendants acquired additional certificates which, together with the certificates already owned by them prior to July 1, 1929, made them the owners of 61 per cent. of the total of such certificates; that the Triplett defendants paid the full face value of practically all such certificates; that two small certificates were purchased at a discount, such discount in one instance being 3 per cent. and in the other between 5 and 10 per cent.

On the 10th day of August, 1931, the Triplett defendants called upon the Security Trust Company to divide the property to which it still held title among the holders of the respective certificates according to the proportionate interest held by each. They claimed the right to direct such division of the property under the following provision of the contract to purchase, to wit: "(2) In case the contract of sale made between the Title Holder and · Messrs. Triplett, Carnahan and Hudson hereinbefore referred to shall not be complied with by said purchasers wholly or in part, the Title Holder is authorized and

directed to dispose of the remainder of the property in its hands in such manner as may be directed by the majority in interest of the owners, or their representatives and assigns, and to distribute the proceeds after first deducting its costs, expenses, and charges as aforesaid, among the owners, their representatives or assigns, pro rata; or in default of any such direction, then according to the principles of equity in such cases obtaining."

The resistance and claims made by the receiver of the National Bank of Arkansas prevented the trustee from acceding to the request of the Triplett defendants; the claims of the receiver being those now asserted by him in this suit.

On the 18th day of August, 1931, the defendant F. H. Triplett, as trustee for himself, his brothers, and his sister, executed and tendered to the said Security Trust Company, as trustee, a release of all of the interest held by him as the holder of all rights of Carnahan, Hudson, and Triplett in the said lands, and a consent that the said Security Trust Company, as such trustee, might cancel such contract to purchase because of the failure of the purchasers to completely perform the same; and as the majority in interest of the owners of the trust certificates they directed the Security Trust Company to accept the release and to execute a deed conveying the lands to the owners of the certificates in proportion to the certificates held by such owners respectively. No contention was made or reason shown why the request of the Triplett defendants were not complied with except the claims made by the receiver of the bank.

■ In the consideration of these facts we take up first the so-called liquidated damage clause of the conditional sales contract.

The trial court held that "the clause of the contract relating to the so-called liquidated damages bears no relation to the actual damages which would be sustained in the event of a breach and is in fact a penalty and unenforcible." It is seen by reference to the wording of the clause that there is imposed on the purchasers an obligation to pay $100,000 as liquidated damages in case they default for a period of 30 days in the payment of "any sum of * * * taxes." They were obligated to pay all state, county, and improvement district taxes, so that the effect of the clause is to make them liable for the payment of $100,000 damages for failure to pay any $100 tax item. Likewise, failure to pay any item, however small, of interest subjects them to the same $100,000 obligation; both of which requirements are unreasonable. But most important, as clearly determining the nature of the $100,000 payment called for, it is to be observed that it is equally applicable to each and every stage in the performance of the conditional sales contract. Even though all of the installment payments had been made up to the very last one, still the seller of the land would be entitled under this provision to hold the land and demand $100,000 additional. It appears, as shown in the foregoing statement of facts, that the purchasers paid $490,000 out of the total of $590,000 agreed upon by them. The trustee still has in its hands 16,422 acres of land out of approximately 25,000 acres originally involved in the contract. It has been paid about five-sixths of the purchase price and has two-thirds of the lands tendered back to it. The clause provides a penalty and not a measure of damage, and so is unenforceable. Kothe, Trustee, v. R. C. Taylor Trust, 280 U.S. 224, 50 S.Ct. 142, 74 L.Ed. 382; Hammett v. Ruby Lee Minar, Inc. et al., 60 App.D.C. 286, 53 F.(2d) 144; C. B. & Q. R. R. v. Dockery (C.C.A.8) 195 F. 221, 224.

Eliminating the penalty clause, we take up the question whether the receiver of the bank may enforce specific performance of the contract of purchase in a suit directly against W. C. Hudson.

It is to be noticed that the contract of purchase provided that prior to the full payment of all the purchase money the purchasers might procure a conveyance of any lands upon payment to the trustee of the sum of $30 per acre (the average purchase price being less than $24 per acre), or, as to those lands which were under contract of sale to other parties, by payment of the remainder due upon their purchase price, which should be credited to the sums payable under the contract.

As it was uncertain at what stage in the performance of the contract default would occur, it could not be foretold how much of the land would be in the hands of the trustee at the time of default in the payment of the purchase money, if there should be such a default. The amount of the purchase money which had been paid at the time of default would naturally determine what steps would be to the best interest of all certificate holders to pur-

sue. If only a comparatively small amount had been paid it would be to the best interest of the certificate holders, except under unusual circumstances, to insist upon the completion of the contract by payment of the balance of the purchase money. On the other hand, if a large amount of the purchase money had been paid the certificate holders, by declaring a cancellation of the contract of purchase, would not only have received the largest part of the purchase money, but would also still have the land. Under these circumstances it might appear, under ordinary circumstances, to be to the best interest of the certificate holders not to engage in litigation for the balance of the purchase money, but to cancel out the contract and keep the paid-up purchase money and the land. It was impossible to determine in advance what, in any given instance, would be the best course to pursue for the benefit of all the certificate holders.

These and the like considerations doubtless determined the incorporation into the contract of the clause to the effect that in case the contract of sale was not fully carried out the trustee should dispose of the remainder of the property in its hands in such manner as may be directed by the majority in interest of the owners. This reasonable provision was supplemented by the clause to the effect that the title holder should be protected in any event by acting upon the written direction and authority of the majority in interest of the owners, as shown by the records kept by it.

It has not been pointed out that this method of bringing the trust to a close in case of default of the purchasers in the sale contract was unreasonable or unfair to any beneficiary. The nature of the transaction was such that it was necessary to lodge somewhere the power to determine what should be done upon failure to carry out their contract on the part of the purchasers. We find no ambiguity and no uncertainty in the contract provision which leaves the determination of the final disposition of the trust, upon failure of the sale, to the majority of the certificate holders. The sons and daughter of C. H. Triplett are the holders of such a majority of the certificates, having obtained the certificates not derived from their father by purchase for practically the full face value thereof.

The National Bank of Arkansas acquired the certificates which it holds through its then managing officer, W. C. Hudson, and so actually knew of the rights conferred upon the majority of the certificate holders by the terms of the contract. The trust receipts taken by it also recite on their face that the contracts of January 2, 1920, are "made a part hereof as if copied at length herein." The bank, therefore, took the certificates subject to the provision that if the sale was not fully consummated through default of the purchasers "the majority in interest of the owners" should direct the disposal of the remainder of the property in the hands of the trustee.

At the time the contract was made R. Carnahan himself was the owner of almost a majority of the certificates, and it is not improbable, as argued by Mr. Triplett, of counsel, that Mr. Carnahan expected to command a majority of the certificate interests after the transaction, as before, and that the clauses were inserted in the contracts with some such consideration in mind.

■ Be that as it may, we agree with the conclusion of the trial court that the provisions of the contracts were valid and controlling, and that the Triplett defendants, as the owners of a majority in interest, had the right to direct the Security Trust Company as to the disposition of the lands remaining in its hands upon the failure of the purchasers to pay out the full contract price of the lands.

■ The position of the receiver of the bank appears to be that it ought not to be left to the majority of beneficial interest to determine whether the purchasers should be sued or allowed to release their equity in the lands to the trustee, as provided by the contract. He claims it is the right of a certificate holder to sue the purchasers or "those who stand in the shoes" of the purchasers directly. He cites no precedent which would appear to justify the position, and says he has been unable to find any after diligent search. As we are unable to find justification for such position, we think the conclusion of the trial court upholding the provisions of the contracts was right. So far as the plaintiff was concerned, the facts made no case in his favor against defendant W. C. Hudson.

It is particularly clear that there are no equities that could move the court to sustain the action of the receiver. As shown in the statement of facts, the National Bank of Arkansas bought the Carnahan

note long after it had ceased to be a negotiable instrument. It was transferred to the bank on the 28th of April, 1930, more than seven years past its due date, while the interest thereon was unpaid in a considerable amount. It was also well known to the bank that default had been made by Carnahan and his associates, purchasers of the lands, in the semiannual payment of $25,000 due July 1, 1929, and in the $25,000 payment due January 1, 1930. Carnahan had died insolvent in 1928, and his estate could not carry out his obligations under the contract.

The receiver presented no grounds to justify any decree against the defendants Triplett by reason of the alleged assumption of obligations of their father. No assumption by them of any obligations of Carnahan was shown. As to Hudson, the right to make decision whether the trustee should retain the lands conditionally sold to him or should sue him (or others claimed to have assumed his obligations) was vested in the trustee under the directions of a majority of those interested in the estate. The receiver of the bank had no independent right of action against Hudson.

The controlling decisions are those referred to by this court in Carson v. Long-Bell Lumber Corp., 73 F.(2d) 397, including Central West Public Service Co. v. Craig, 70 F.(2d) 427; Rodman v. Richfield Oil Co., 66 F.(2d) 244; Home Mortgage Co. v. Ramsey, 49 F.(2d) 738, and Allan v. Moline Plow Co., 14 F.(2d) 912.

It is practically universal custom in transactions of the nature of the one presented in this case to make provision in anticipation of default by the purchaser. It may be that sales by deed and mortgage are more common than the conditional sale reflected by the documents in this case, but both are familiar transactions. In the case where a sale is carried out by a deed and mortgage, a default on the part of the purchaser does not leave the land sold "in the hands of" the seller. The seller has only the purchaser's obligation to pay and the right of foreclosure. Where there is a conditional sales contract, as in the case at bar, the purchaser's default does leave the lands unconveyed by the seller and "in the hands of the seller undisposed of". Therefore, the provisions of the contract in this case were appropriate to the nature of the transaction. They were reasonable and should be upheld to the extent that the owners of the majority beneficial interest should be given the right to determine the course of the trustee.

The decree of the district court, in so far as it dismissed the suit of the receiver, is, therefore, right and should be and is sustained.

In addition to dismissing the suit of the receiver the district court, for the purpose of settling the controversy between the receiver and the Triplett defendants who were parties before the court, decreed that as between them the Triplett defendants, as the owners of a majority in interest of the trust estate, had the right under the provisions of the contract to direct the trustee to cancel the conditional sales contract, accept the tender of the lands back from the Triplett defendants, and divide the same between the Triplett defendants and the receiver of the bank, subject to the right of the trustee to fees and charges.

Being satisfied that the receiver had no right to recovery upon his theory of the case, there appears no injustice in the disposition of the controversy made by the trial court.

The question as to the right of the receiver to maintain any action without having made the Security Trust Company, the trustee, a party, is not passed on.

Decree affirmed.