**CEDAR POINT APARTMENTS, LTD., a limited partnership by John G. Ariko, its general partner, Appellant,**

v.

**CEDAR POINT INVESTMENT CORP., a Missouri corporation and William Bruce**

and Donald Ham; Donn H. Lipton; Robert B. Millard; McDonnell Douglas Corp.; Christina Ferer Millard; Patricia Ferer; Gershman Investment Corp.; Community Federal Savings & Loan, Appellees.

**WELLINGTON GREEN APARTMENTS, LTD., a limited partnership and Anthony J. Nicholson as general partner, Appellant,**

v.

**B & D INVESTMENT CORPORATION; William Bruce; Donald Ham; Donn H. Lipton; Robert B. Millard; McDonnell Douglas Corp.; Christina Ferer Millard; Patricia Ferer; Missouri Savings Association, Appellees.**

No. 81–2413.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1982.

Decided Nov. 17, 1982.

Rehearing and Rehearing En Banc Denied Dec. 22, 1982.

Chester A. Love, Daniel P. Card II, St. Louis, Mo., for appellees; Love, Lacks, McMahon & Paule, St. Louis, Mo., of counsel.

Shostak & Witzel, P.C., Burton H. Shostak, St. Louis, Mo., for appellants.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and FAIRCHILD,* Senior Circuit Judge.

LAY, Chief Judge.

This appeal involves a consolidation of two actions involving breach of contracts, tortious interference with contracts, and conspiracy to tortiously interfere with contracts for the sale of two apartment complexes. The district court, the Honorable James H. Meredith presiding, dismissed both cases on the grounds that the plaintiff-purchasers lacked standing to sue or, in the alternative, that plaintiffs initially breached the contracts and therefore could not recover damages for any breach by the defendant-sellers. 527 F.Supp. 602, 609–10 (E.D. Mo.1981). We reverse; we hold that the plaintiffs have standing to sue, and that under the evidence presented they are entitled to recover for the sellers' breach of the contracts.

*Facts.*

Donald Ham and William Bruce, owners of the Wellington Green Apartments and the Cedar Point Apartments, employed DRG Financial Corporation in 1978 to act as their agent in all phases of application for F.H.A. Mortgage Insurance Commitments and to act as F.H.A.-approved mortgagee in

* Thomas E. Fairchild, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

processing F.H.A. insured loans on the two apartment complexes. DRG was additionally retained by Ham and Bruce as a broker and was given the exclusive right to sell both complexes. In the fall of 1978, Anthony Nicholson and John Ariko, through DRG, began preliminary negotiations with Ham and Bruce for the purchase of the properties. In January 1979 two contracts drafted by DRG were executed. Each contract required the purchasers to make a $20,000 earnest money deposit in the form of an irrevocable letter of credit in favor of the sellers no later than January 30, 1979.

On February 12, 1979, Nicholson sent two personal checks totalling $40,000 to DRG with instructions not to deposit until further authorization; Nicholson also advised DRG that he was arranging a bank letter certifying availability of funds for the checks. On March 8, 1979, the Florida National Bank sent DRG a letter stating that Nicholson had a line of credit with the bank to provide for the $40,000 advance and setting forth a method of payment in the event of insufficient funds for Nicholson's checks. On May 10, 1979, the sellers sent a mailgram to DRG which declared that the Florida bank letter did not meet the contractual requirements and instructed DRG to obtain compliance by May 16, 1979. DRG notified Nicholson that he must tender a $40,000 certified check or an irrevocable letter of credit by May 16. On May 15 Nicholson responded with a mailgram protesting the demand and claiming that the bank letter complied with the contract provisions; on May 17, however, he again mailed two personal checks totalling $40,000 to DRG.

Upon receipt of the checks DRG informed Ham of the payment; Ham instructed DRG to continue to work toward a closing under the two contracts. DRG cashed the checks and held the proceeds.

Each contract provided that a substantial portion of the purchase price was to be funded by secured notes insured by the F.H.A. The F.H.A. commitments to insure this primary funding were scheduled to expire ninety days after they were granted, or on June 14, 1979; closings on the sales of the apartments were contractually designated to occur contemporaneously with the closings on the F.H.A.-insured loans. On June 8, 1979, with various preliminary contractual duties of both parties still incomplete, DRG requested a thirty-day extension from the F.H.A. on the commitments. The request was granted thereby extending the expiration of the commitments to July 16, 1979.

On June 8, 1979, Nicholson, who had been designated as the purchaser under the contracts, executed written assignments of all his rights in the two sales contracts to two limited partnerships. He was the general partner of one partnership, Wellington Green Apartments, Ltd.; John Ariko was the general partner of the other partnership, Cedar Point Apartments, Ltd. Ham, Bruce, Nicholson, and Ariko had previously agreed that the contracts would be assigned to two Florida limited partnerships to be formed by Nicholson and Ariko.

On June 12, 1979, Ham demanded fifteen days prior notice of the actual closing date, claiming that the contract required such notice; an attorney for the purchasers responded the next day with a letter specifying a June 29, 1979, closing date. On June 14, the sellers, who had not yet received the attorney's letter specifying a June 29 closing or DRG's notification of the thirty-day commitment extensions, appeared for closing at the F.H.A. offices. Later that same day, the sellers gave DRG written notice of immediate termination of both contracts on the ground that the purchasers had defaulted. The sellers demanded receipt of the $40,000 deposit as liquidated damages.

On June 18, 1979, the sellers discharged DRG as their agent. DRG asked Don Ham to suggest some way that the two apartment deals could be closed; in response, the sellers began immediate but unsuccessful renegotiations with the purchasers for the sale of the same properties at a higher price. Neither party appeared for the scheduled June 29 closing, and the F.H.A. commitments expired on July 16, 1979.

The two limited partnerships brought these actions on August 17, 1979, seeking specific performance of the contracts, damages equal to additional financing costs, actual damages for breach of contract, and actual and punitive damages for tortious interference with the contracts and conspiracy to interfere with the contracts. Each of the apartment complexes involved in the dispute was sold to third parties after the suits had been filed and the issue of specific performance was essentially abandoned at trial. The case was tried before the court for a week, and the district court judge ultimately dismissed both actions with prejudice. The partnerships now appeal contending that certain findings of the district court are clearly erroneous and that the trial court improperly concluded that they lack standing to sue.

*Standing: The Restrictions on Assignment.*

The contracts contain virtually identical provisions, including those relevant to the assignment issue. Each contract stipulates that it was entered into between the sellers and "ANTHONY J. NICHOLSON and/or ASSIGNS (hereinafter referred to as 'Purchaser')." Paragraph 21 of each contract provides: "The principals to this Agreement mutually agree that it shall be binding upon them, their and each of their respective heirs, executors, administrators, successors, and assigns." Paragraph 28 of each agreement is an assignment clause which states:

Purchaser shall have the right to assign this Agreement to any partnership of

which [sic][1] is a general partner; provided, however, that Purchaser shall have such right of assignment only if such assignee or transferee shall in writing expressly assume and agree to perform and discharge each and every obligation and liability of Purchaser set forth in this Agreement.

▮ The district court held that the assignments of the contracts to the limited partnerships by Nicholson were void. The court found that the assignments were invalid on the grounds that paragraph 28 of each contract contained two express limitations on the power to make assignments which were not complied with: (1) Nicholson had not obtained a written assumption of duties from the assignee partnerships as mandated; and (2) Nicholson was merely a limited partner, not a general partner, of one of the partnerships. We respectfully must disagree. We hold that the assignments were valid. In construing paragraph 28 of the contracts, we hold as a matter of law that this paragraph serves only as a restriction on the delegation of duties, and not on the assignment of rights. Furthermore, even if it is argued that paragraph 28 was intended to affect the assignment of rights, the *power* to assign in violation of the restrictions is not affected by any stipulation in the contracts.

The provision in paragraph 28 of each contract that "Purchaser shall have the right to assign this Agreement" is an expressly permissive,[2] not prohibitive, form of

---

1. When the district court quoted this paragraph in its opinion, it apparently overlooked the contracts' omission of a word or words here, and inserted the word "it" where the omission appeared.

2. The clause indicates the intent of the sellers and the broker-mortgagee DRG to permit the delegation of the otherwise nondelegable duty of tendering promissory notes. Such a nondelegable duty is nevertheless delegable with or without an assignment of rights if the obligee-seller consents. *See* 4 A. Corbin, *Corbin on Contracts* § 865, at 445–46, § 870, at 475–76 (1951); J. Calamari and J. Perillo, *The Law of Contracts* §§ 18–25, –28 (2d ed. 1977); 3 S. Williston, *A Treatise on the Law of Contracts* §§ 411, 411A (3d ed. 1960); Restatement

(Second) of Contracts § 318(2) & comment c (1981).

The consent granted in paragraph 28 by the sellers and the mortgagee to the purchasers permitted delegation of the purchaser's duties to certain partnerships; however, in addition to delegation with the assignor remaining accountable, there must also be a promise by the assignees to perform. *See* 3 S. Williston, *supra*, § 418, at 101–03.

Paragraph 28 of the contracts is not the sole evidence of this advance consent to delegation of the purchaser's duties. The fact that "Nicholson and/or Assigns" are specifically designated as the "Purchaser" in the contracts also discloses this permissive intent. *See* 4 A. Corbin, *supra*, § 871, at 478–79; Restatement (Second) of Contracts § 323 comment b (1981).

assignment clause. Two restrictions, however, qualify this permission. As to the first restriction, each contract contains a typographical error: the purchaser's right to assign only extends "to any partnership of which [sic] is a general partner." Second, a concomitant duty is imposed if an assignment is made: the "Purchaser shall have such right of assignment only if such assignee or transferee shall in writing expressly assume and agree to perform" the purchaser's obligations under the contract.[3]

■ Initially we must note the difficulties that have arisen when the phrase "assignment of the contract" has been employed. This ambiguous expression has been inartfully used to refer solely to an assignment of rights, solely to a delegation of duties, or to encompass both assignment of rights and delegation of duties. *See* J. Calamari and J. Perillo, *The Law of Contracts* § 18–1 (2d ed. 1977); 4 A. Corbin, *Corbin on Contracts* § 864, § 873, at 494 (1951); 3 S. Williston, *A Treatise on the Law of Contracts* § 407 (3d ed. 1961). However, unless intent to the contrary is shown, a contractual prohibition against "assignment of the contract" is presumed as a matter of law to refer only to delegation of contractual duties, not assignment of rights. *See Charles L. Bowman & Co. v. Erwin,* 468 F.2d 1293, 1297–98 (5th Cir. 1972); 4 A. Corbin, *supra*, § 872, at 484; 3 S. Williston, *supra*, § 422, at 138–39; Restatement (Second) of Contracts § 322(1) (1981). A contract provision expressly permitting assignment of the contract, as in paragraph 28, should likewise be so construed. Beyond the use of the phrase "right to assign this Agreement" in paragraph 28, no intent is shown that the restrictions contained in the paragraph apply to assignment of the purchaser's rights under the contracts. The clause does refer to "such assignee or transferee," but the addition of these words cannot be said to clarify the parties' intent.

■ These contract rights were freely assignable to the two limited partnerships. No material change in the sellers' duty to convey title to the realty or chance of receiving return performance occurred by these assignments of Nicholson's rights as purchaser under the contracts. *See* Restatement (Second) of Contracts § 317(2)(a)

---

Likewise, paragraph 21 of both contracts specifying that each agreement is binding on the principals and "each of their respective ... assigns" is evidence of consent to the delegation of an otherwise nondelegable duty. 4 A. Corbin, *supra*, § 871, at 481; *cf. Little Rock Surgical Co. v. Bowers,* 227 Mo.App. 744, 747, 42 S.W.2d 367, 369 (1931); *In re Frayser's Estate,* 401 Ill. 364, 372, 82 N.E.2d 633, 638 (1948); *Baum v. Rock,* 106 Colo. 567, 574, 108 P.2d 230, 234 (1940) (conclusive evidence of intent). Additionally, the evidence presented during trial indisputably showed that during negotiation of the contracts, both parties anticipated that limited partnerships to be formed by Nicholson and Ariko would take over the contracts.

3. The Restatement (Second) of Contracts § 328 (1981) provides that, unless the language or circumstances indicate the contrary, an "assignment of the contract" or of "all my rights under the contract" is not only an assignment of the assignor's rights but also a delegation of his unperformed duties under the contract; acceptance of such an assignment by an assignee is presumed to be a promise to perform the assignor's unperformed duties. *But cf. Hahn v. Earth City Corp.,* 625 S.W.2d 640, 643 (Mo. App.1981) (unclear if Missouri accepts this pre-

sumption). An exception to this rule of construction exists, however, when a purchaser makes an assignment of a contract for the sale of land. Analogous to the situation where land is sold "subject to" a mortgage, no promise to assume the vendee's duties by the assignee is implied merely from the acceptance of the assignment without the presence of other circumstances indicative of such intent. *Hahn v. Earth City Corp.,* 625 S.W.2d 640, 643 (Mo. App.1981); Restatement (Second) of Contracts § 328 comment c (1981); *see Senn v. Manchester Bank of St. Louis,* 583 S.W.2d 119, 127 (Mo.1979) (en banc); *State ex rel. Hoyt v. Shain,* 338 Mo. 1208, 1218, 93 S.W.2d 992, 997 (1936); *Futrall v. Triplett,* 84 F.2d 861, 863 (8th Cir.1936).

Paragraph 28, with its provision that the assignee "shall in writing expressly assume and agree to perform" the purchaser's duties, clearly reveals the intent necessary to overcome this exception. Whether the phrase "right to assign this Agreement" in paragraph 28 was intended to refer to assignment, delegation, or both, *see* 4 A. Corbin, *supra*, § 864; 3 S. Williston, *supra*, § 407, a promise by the assignees to perform the purchaser's duties is mandated by the terms of each contract.

(1981). Such assignments were anticipated, and the assignor Nicholson, whether or not a general partner of each assignee, would remain liable on the notes. *See Missouri Pacific Railroad Co. v. Rental Storage & Transit Co.,* 524 S.W.2d 898, 906 (Mo.App. 1975).

■ Alternatively, even if the phrase "right to assign this Agreement" in paragraph 28 is construed to apply to an assignment of rights, no intent is thereby shown to eliminate the *power* to assign the contracts in violation of the restrictions. The Restatement (Second) of Contracts § 322(2)(b) (1981) states the general rule that "[a] contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, ... gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective...." Most significantly for purposes of this appeal, neither the form nor terminology of paragraph 28 purports to clearly bar the power to assign or to invalidate an assignment not made in compliance with the restrictions. Merely the "right to assign," not the power to assign, is limited by the ex-

press language of the clause. No intent is thereby revealed to avoid an assignment not meeting the restrictions.[4] *See Detroit Greyhound Employees Federal Credit Union v. Aetna Life Insurance Co.,* 381 Mich. 683, 688, 167 N.W.2d 274, 277–78 (1969); 4 A. Corbin, *supra,* § 873, at 494.

Other portions of the contract likewise do not reveal any intent to affect the validity of an assignment in violation of the contracts. To the contrary, other contractual provisions, such as the specification of the purchaser as "Nicholson and/or Assigns," and the clause binding the principals and their "assigns,"[5] as well as the circumstances surrounding the negotiation and execution of these contracts, strongly support the inference that paragraph 28, if it was intended to apply to an assignment of rights, was not intended to preclude the power to assign in violation of the restrictions.

We thus hold that these assignments are valid and that the assignee partnerships have standing to sue in this case as the real parties in interest. *See* Mo.Ann.Stat. § 507.010 (Vernon 1952).

4.  One recognized commentator has pointed out that a contractual provision forbidding or restricting an assignment of rights under the contract may take any one of at least three distinct forms. J. Murray, Jr., *Murray on Contracts* § 306, at 623 (2d rev. ed. 1974); G. Grismore, *Effect of a Restriction on Assignment in a Contract,* 31 Mich.L.Rev. 299, 299–300 (1933). Only one of these forms reveals the intent necessary to preclude the power to assign or to cause an assignment violative of contractual conditions to be wholly void. Such a clause must contain express provisions to the effect that any *assignment* shall be void or that any assignment shall be invalid if not made in a certain specified way. *See Allhusen v. Caristo Constr. Corp.,* 303 N.Y. 446, 450, 103 N.E.2d 891, 892–93 (1952); 3 S. Williston, *supra,* § 422 n.6, at 130; J. Murray, Jr., *supra,* § 306, at 623; G. Grismore, *supra,* at 299–300; *cf. Silliman v. Chrisman,* 584 S.W.2d 441, 447 (Mo.App.1979); *Portland Elec. and Plumbing Co. v. City of Vancouver,* 29 Wash.App. 292, 294, 627 P.2d 1350, 1351 & n.1 (1981).

    If the contract provides that an assignment will make the *contract* void, the assignment is effective but the nonassigning party has the right to avoid the contract for breach of a condition precedent to his duty to perform. J. Murray, Jr., *supra,* § 306, at 623. On the other

hand, the contract may contain only a promise by one or both parties to refrain from assigning or a promise to assign only under certain conditions. The promise creates a duty in the promisor but its breach does not render the assignment ineffective. *Hanigan v. Wheeler,* 19 Ariz. App. 49, 52, 504 P.2d 972, 975 (1972); *Murray First Thrift and Loan Co. v. Stevenson,* 534 P.2d 909, 911 (Utah 1975); J. Murray, Jr., *supra,* § 306, at 623; 3 S. Williston, *supra,* § 422, at 130–31 & n. 6; G. Grismore, *supra,* at 300. If a breach of such a promise goes to the "root" or "essence" of the contract, the other party would have the option to avoid the contract on the basis of breach of a constructive condition. If such breach is not material, however, the other party merely would have an action for specific performance or for damages for breach of contract. G. Grismore, *supra,* at 300; *see* Restatement (Second) of Contracts §§ 225, 237, 241 (1981).

    Although paragraph 28 is an affirmative grant of permission to delegate, these three conceptual distinctions are equally applicable and helpful in analyzing its effect since the permission it grants is subject to restrictions.

5.  See *supra* note 2.

*Avoidance of the Contract.*

Moreover, the sellers cannot successfully urge that they can avoid the contract on the ground that express conditions precedent to their duties were not fulfilled or that the assignments were a material breach of the contracts. The sellers initially dispute the assignments on the ground that there were no written promises from the assignees to comply with the stipulation that "Purchaser shall have such right of assignment only if such assignee or transferee shall in writing expressly assume and agree to perform" all the purchaser's duties under the contracts. Although there was no actual writing by the assignees,[6] we find that a valid and binding promise to assume the purchaser's duties can be implied from the conduct of the assignee partnerships. Even though an assumption of duties by the assignees is not presumed merely from acceptance of the assignment of these contracts,[7] the assignees may show intent to bind themselves by their actions, such as by suing for specific performance of the contracts as the assignee partnerships originally did here. *Epstein v. Gluckin,* 233 N.Y. 490, 493, 135 N.E. 861, 862 (1922) (Cardozo, J.); Restatement (Second) of Contracts § 328 comment c (1981); *see United Brick & Tile Co. v. McKissick,* 51 F.2d 67, 69 (8th Cir.), *cert. denied,* 284 U.S. 677, 52 S.Ct. 131, 76 L.Ed. 572 (1931); *Kneberg v. H.L. Green Co.,* 89 F.2d 100, 103 (7th Cir.1937).[8]

The sellers here obtained what they bargained for, although in a different form from that specified by contract. The object of the restriction requiring a written promise has been accomplished. *See Cheney v. Bilby,* 74 F. 52, 64–65 (8th Cir.1896). The stipulation of a written promise is at most a condition of the purchaser's "right to assign." Such a condition may be excused without other reason if its requirement will involve extreme forfeiture or penalty, and its existence or occurrence does not form an essential part of the exchange for the promisor's performance. *Cessna Aircraft Co. v. Aviation, Inc.,* 243 F.2d 815, 819 (10th Cir.1957). The absence of a written assumption of duties thus does not give these sellers the option to avoid the contracts for violation of an express condition precedent to their duty to convey.[9]

Furthermore, construing this provision as a promise that a written assumption would be made if the contracts were assigned, we find substantial compliance existed. *See Gundaker v. Templer,* 560 S.W.2d 306, 309–10 (Mo.App.1977). Nichol-

---

6. It is readily apparent that the writing itself was not the operative goal under this restriction; rather, the writing was only a means to an end. *See* 3A A. Corbin, *supra,* § 650, at 114.

7. See *supra* note 3.

8. Other courts have held that assignees of a contract for the sale of land impliedly assume duties if they accept the assignment with notice of a provision within the contract that it is binding upon assigns. *See* 3 S. Williston, *supra,* § 418A n. 16 (citing cases). In any event, when it is unclear whether an assumption as well as a delegation of duties has occurred, the mere presence in the original contract of a clause to the effect that assigns are bound is strong evidence of intent of assumption when there is an "assignment of the contract." 4 A. Corbin, *supra,* § 871, at 481; *cf. Kneberg v. H.L. Green Co.,* 89 F.2d 100, 103 (7th Cir.1937) (the clause does not of itself impose an obligation on assignee, but gives him an option to be bound).

9. The distinction between a mere promise or assurance that future performance will occur and a condition precedent to the duty of the other party is based upon intent. 3A A. Corbin, *supra,* § 633, at 32. The law does not favor conditions which cause forfeiture, *see Miran Inv. Co. v. Medical West Bldg. Corp.,* 414 S.W.2d 297, 304 (Mo.1967); 3A A. Corbin, *supra,* § 635, and thus courts will not construe contract provisions to be conditions precedent to another party's duty under the contract unless "required to do so by plain, unambiguous language or by necessary implication." *Kansas City S. Ry. Co. v. St. Louis-San Francisco Ry. Co.,* 509 S.W.2d 457, 460 (Mo.1974); *see* 5 S. Williston, *supra,* § 665. Words of condition, such as "upon condition that" or "provided" are not conclusive to distinguish between intent to create a condition precedent to another party's duty to perform and intent to merely covenant or promise. *Green County v. Quinlan,* 211 U.S. 582, 594, 29 S.Ct. 162, 167, 53 L.Ed. 335 (1909); *Southern Surety Co. v. MacMillan Co.,* 58 F.2d 541, 547 (10th Cir.), *cert. denied,* 287 U.S. 617, 53 S.Ct. 18, 77 L.Ed. 536 (1932).

son did not make the written assignments to the partnerships until June 8, 1979; the partnerships did not file certificates of limited partnership with the state until June 13, 1979; the sellers declared the purchasers in default on June 14, 1979. The purchasers did not have a reasonable time before the contracts were terminated in which to deliver written promises to assume. Moreover, under the circumstances of this case, a written document evidencing an assignee's intent to assume was "merely an act to be performed in fulfillment of the ultimate contract objective, sale of the property and payment of the purchase price," and would have been a "routine element commonly attaching to the closing" of the sale of these properties. *Cohen v. Crumpacker,* 586 S.W.2d 370, 375 (Mo.App.1979). Since the closings were never held, the assignee partnerships showed clear intent to assume the purchaser's duties within a reasonable time. *See* Restatement (Second) of Contracts § 204 (1981); 3A A. Corbin, *supra,* § 716. Thus substantial compliance with this restriction existed and there was no breach of a constructive condition of the contracts. *See Pasquel v. Owen,* 186 F.2d 263, 269–70 (8th Cir.1950). The sellers are limited to merely seeking damages, if they can prove any, for breach of the restriction requiring a written assumption of duties.

■ The sellers also contend one assignment is defective because Nicholson is a limited partner, not a general partner, of one of the assignee partnerships in violation of the restriction that "Purchaser shall have the right to assign this Agreement to any partnership of which [sic] is a general partner." We find that, under the circumstances present here, the sellers cannot use this stipulation to avoid their contractual duties on the basis of either an unfulfilled condition precedent or a breach of a constructive condition inferred from a promise.

In the Wellington Green Apartments' partnership, Nicholson is the general partner as well as one of the limited partners; John Ariko is the "initial limited partner" and one of the regular limited partners. In the Cedar Point Apartments' partnership, their roles are reversed so that Nicholson is not specified as a general partner.[10]

The trial court specifically found that Ariko as well as Nicholson had participated fully in the negotiations. 527 F.Supp. at 606. Both Nicholson and Ariko testified that before the execution of the contracts they discussed with the sellers the possibility that their roles as general partner and special limited partner might be reversed for financing purposes in one of the assignee partnerships to be formed. Both reported the sellers' response to be merely that they had done the same thing themselves on occasion. The testimony of Thomas Barken, associate of DRG and sellers' local sales agent, is also in accord on this point. Bill Bruce, one of the sellers, conceded in testimony that it probably would not make any difference to him as seller whether Ariko or Nicholson was a general partner.

Additionally, in paragraph 16(b) of each contract, the seller warrants "[t]hat Seller understands that various divisions and subsidiaries of Purchaser, and officers, principals and stockholders thereof may be involved in this transaction as real estate brokers, mortgage brokers, general partners, limited partners, or agent or principal for the sale of mortgage-backed securities." Moreover, the F.H.A. commitments, applied for by DRG after the execution of the contracts, list the proposed mortgagors on the projects as "Anthony J. Nicholson & John G. Ariko, General Partners, Partnership to be formed."

The evidence thus overwhelmingly supports the conclusion that John Ariko was intended by all the parties as a possible general partner of one assignee partnership.

---

**10.** Despite the different nomenclatures applied to Nicholson's status in the partnerships, Nicholson, as either general partner or "initial limited partner," shares in 4% of the general profits and losses and 33.33% of the profits from major capital events in both partnerships. Ariko, on the other hand, as either general partner or "initial limited partner," shares in only 1% of the general profits and losses and 16.67% of the profits from major capital events in both partnerships.

Although insertion of the word "it" into the deleted portion of paragraph 28 of both contracts would probably allow the paragraph to be read the way it was originally drafted, we find that such an interpretation clearly fails to express correctly the understanding reached by the parties as to the permissible structure of the limited partnerships. Whether we employ a process of interpretation, including the rule construing doubtful provisions against the drafting party, *Eastmount Construction Co. v. Transport Manufacturing & Equipment Co.,* 301 F.2d 34, 41 (8th Cir.1962); 3 A. Corbin, *supra,* § 559, or employ the vehicle of contract reformation to correct a mistake in the written expression of the parties' agreement, *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 268 (Mo.1973) (en banc); *Edwards v. Zahner,* 395 S.W.2d 185, 189–90 (Mo.1965); Restatement (Second) of Contracts §§ 155, 156 (1981), the sellers cannot avoid their duties under these contracts on the ground that Nicholson was not explicitly made a general partner of one assignee partnership when the evidence of the parties' true intent is so one-sided.[11]

*The Contract Benefits.*

In an alternative finding, the district court held that, even if the limited partnerships did have standing, they could not claim the benefits of the contracts because they failed to meet the June 14, 1979, closing date. 527 F.Supp. at 610. The court reasoned that the sellers only partially waived the purchasers' initial breach when they accepted the late down payment. It held that the sellers conditioned further contract performance on a closing date on or before June 14, 1979, the originally scheduled expiration date of the F.H.A. commitments.

Paragraph 14(a) of both contracts stipulates that the closings on the sale of the apartments are to occur contemporaneously with the closings on the F.H.A.-insured loans.[12] At the time these contracts were executed, the parties did not have firm commitments from the F.H.A. to insure the first mortgages, and thus did not know the expiration date of such commitments. When the firm commitments were issued on March 16, 1979, they were scheduled to expire June 14, 1979, unless an extension of time was granted.[13]

After the sellers rejected Nicholson's letter of credit and demanded contract compliance by May 16, 1979, Nicholson protested the sellers' action by telegram and conclud-

---

**11.** This conclusion does not prejudice the sellers. Nicholson remains personally liable on the performance of the contract as the original purchaser and assignor. *Missouri Pac. R.R. Co. v. Rental Storage & Transit Co.,* 524 S.W.2d 898, 906 (Mo.App.1975). With Ariko designated as general partner of one partnership, the sellers in fact have increased their security; Ariko by such partnership formation subjects himself to personal liability beyond his ownership as a limited partner. *Compare* Mo. Ann.Stat. §§ 359.090, 358.150 (Vernon 1968) *with* Mo.Ann.Stat. § 359.070 (Vernon 1968). Additionally, because of Nicholson's control over the disputed partnership, the purchasers have a strong argument in their contention that Nicholson would be found by a court to be a general partner as a matter of law. *See Filesi v. United States,* 352 F.2d 339, 341 (4th Cir. 1965); Mo.Ann.Stat. § 359.070 (Vernon 1968); *see also Garbo v. Hilleary Franchise Systems, Inc.,* 479 S.W.2d 491, 497–98 (Mo.App.1972).

**12.** Paragraph 14(a) states:
*Time.* Settlement (closing) hereunder shall take place contemporaneously with the closing of the insured mortgage loan contemplat-

ed by Paragraph 10 hereof, and if the closing of the sale contemplated by this Agreement shall not have occurred on or before the expiration of said commitment through a failure or refusal on the part of Purchaser to perform its obligations hereunder, then this Agreement shall be null and void and of no further force or effect and the deposit made pursuant to paragraph 4 hereof shall be paid to seller free and clear of any and all claims or rights of Purchaser.
Paragraph 27 of each contract provides: *"Closing.* The reference herein to closing means the closing held in which the first mortgage note is endorsed pursuant to the FHA conditional commitment attached hereto as Exhibit 'B'."

**13.** The F.H.A. commitments both stated: "This commitment shall expire 90 days from date of commitment, unless duly extended in writing by the Commissioner and upon such expiration all rights and obligations of the respective parties shall cease."

ed: "It is my intent to close the contracts within the FHA commitment deadline of June 16 1979 . . . ." This telegram was sent two days before Nicholson mailed the personal checks for $40,000 to DRG on May 17. When these checks were accepted and the sellers authorized DRG to proceed to closing, neither DRG nor Nicholson were expressly informed by the sellers of any conditions attached to acceptance of the delayed deposit. On May 22, 1979, shortly after Nicholson had sent the checks which were cashed, Joseph Baron, attorney for the purchasers, sent a letter to DRG confirming the intent and ability of the purchasers to close the sale and stating: "Said closings will be accomplished prior to the scheduled expiration of HUD's commitments to insure."

At the time of these declarations by Nicholson and Baron concerning the closing date, the scheduled expiration date on the loan commitments happened to be June 14, 1979. On June 8, 1979, however, an extension of the loan commitments was requested by DRG.

■ We do not find sufficient evidence to support the sellers' contention and the trial court's finding, see 527 F.Supp. at 607, that sellers were "induced and persuaded to proceed with the deal" by representations from Nicholson and his attorney that closing would occur on or before June 14. As phrased, the statements by Nicholson and Baron concerning a closing date clearly do not reveal intent to offer new concessions to the sellers as compensation for the purchasers' breach of the deposit stipulations in the contracts. Both statements merely tracked the terminology employed in paragraph 14(a) of the contracts in reference to the then scheduled expiration date of the commitments. Such statements only show agreement to do that which the purchasers were already legally liable at that time to do. See In re Windle, 653 F.2d 328, 331 (8th Cir.1981); R-Way Furniture Co. v. Powers Interiors, Inc., 456 S.W.2d 632, 637 (Mo.App. 1970). There is not any evidence to show that both parties agreed that acceptance of the delayed checks would be conditioned on

a closing date on or before June 14, rather than on or before the expiration date of the commitments. See Nicholls v. Kammerich, 626 S.W.2d 653, 656–57 (Mo.App.1981); Campbell v. Richards, 352 Mo. 272, 273, 176 S.W.2d 504, 505 (1944). Moreover, there was not a writing to modify the express terms of these contracts for the sale of land. See Three-O-Three Investments, Inc. v. Moffitt, 622 S.W.2d 736, 740 (Mo.App. 1981); Gee v. Nieberg, 501 S.W.2d 542, 544 (Mo.App.1973); John T. Brown, Inc. v. Weber Implement & Automobile Co., 260 S.W.2d 751, 755 (Mo.1953). We thus find that the sellers voluntarily and unconditionally waived Nicholson's default under the deposit provisions of the contracts when DRG accepted and retained the personal checks for $40,000 and the sellers instructed DRG to continue to proceed toward closing. See Three-O-Three Investments, Inc. v. Moffitt, 622 S.W.2d at 740–42; Plymouth Securities Co. v. Johnson, 335 S.W.2d 142, 152 (Mo.1960); Johnson v. Farrow, 594 S.W.2d 655, 658 (Mo.App.1980); Domyan v. Dornin, 356 S.W.2d 70, 72 (Mo.1962); 3A A. Corbin, supra, §§ 723, 755.

■ We also find that the contract closing date was effectively extended beyond June 14, 1979, when DRG, as agent of the sellers, requested and was granted an extension of the expiration date of the F.H.A. firm commitments. The purposes of the contracts and the language of paragraph 14(a) concerning closing did not mandate that the contract closings occur on or before June 14, 1979, once that was no longer the expiration date on the commitments. The financing arrangements under which these apartments were to be sold made it imperative that closing occur on or before the expiration of the F.H.A. firm commitments to insure the loans. Because the F.H.A. program made the transaction possible, time was of the essence. Paragraph 14(a) of the contracts reveals the parties' clear intent that closings on the sales and the loans would take place contemporaneously either on or before the expiration date of the commitments. See Cochran v. Grebe, 578 S.W.2d 351, 353–54 (Mo.App.1979);

*Johnson v. Schuchardt,* 333 Mo. 781, 786, 63 S.W.2d 17, 19 (1933). Significantly, the very terms of the F.H.A. commitments, incorporated into both contracts, contemplated possible extensions of the originally scheduled expiration date. When DRG extended the expiration date on the commitments, the contract parameters concerning time for performance were also extended in accordance with the plain language and express stipulations in the agreements. *See Standard Title Insurance Co. v. United Pacific Insurance Co.,* 364 F.2d 287, 289 (8th Cir.1966); *O.A. Talbott & Co. v. Byler,* 217 S.W. 852, 853 (Mo.App.1920).

Until June 18, 1979, when DRG was discharged by the sellers, it was expressly authorized to act as the sellers' agent in all phases of application for the F.H.A. mortgage insurance commitment and to also act as F.H.A.-approved mortgagee.[14] Although the sellers were unhappy with the extension of the expiration date, they are bound by this act of their agent. Whether or not the extension request was actually authorized by the sellers, an issue disputed by the parties, DRG was cloaked with broad apparent authority to bind the sellers on all matters pertaining to the F.H.A. applications, including the extension. *See* Restatement

(Second) of Agency §§ 8, 145 (1958). The sellers in fact, in a letter to DRG, stated that they were terminating the relationship on the ground that DRG "had previously agreed to act as our agent" but "the principal thrust of . . . [DRG's] . . . efforts have been to serve the interest of the buyer under contract."

The fact that DRG may have been a dual agent does not change this result. DRG was authorized to act in its various capacities with the knowledge and consent of both parties. *See Macalco, Inc. v. Gulf Insurance Co.,* 550 S.W.2d 883, 895 (Mo.App. 1977); *Burton v. Pet, Inc.,* 509 S.W.2d 95, 100 (Mo.1974). DRG was not guilty of any misconduct, nor can it reasonably be said that it acted adversely to the sellers' interests or tortiously when it extended the expiration date. *See Thomason v. Miller,* 555 S.W.2d 685, 688 (Mo.App.1977); *Cossairt v. Reich,* 370 S.W.2d 291, 295 (Mo.1963); *Fuchs v. Leahy,* 321 Mo. 47, 55, 9 S.W.2d 897, 900 (1928). Both the purchasers and sellers had contract duties uncompleted at the time of the extension request;[15] both could reap possible benefits from an extension of the expiration date. *See Dillard v. Rowland,* 520 S.W.2d 81, 91 (Mo.App.1974).

14. This finding of the trial court, 527 F.Supp. at 606, is based on an agreement entered on January 12, 1978, by Bill Bruce on behalf of the sellers with DRG.

15. In a June 14, 1979, letter, David Dempsey, an attorney for the purchasers, advised the sellers that closing could not occur at that time, because, among other reasons: (1) the sellers failed to authorize DRG to sell the GNMA Securities on the open market, thereby establishing the discount points the sellers were to pay, or in lieu thereof, the sellers failed to obtain agreements from their existing mortgagees to accept GNMA Securities; (2) the sellers failed to authorize the existing mortgagees to release to the purchasers or DRG the amounts necessary to pay off the existing deeds of trust; and (3) the sellers failed to complete certain interior repairs on the Wellington Green Apartments and as a result the HUD inspection of these apartments could not be completed.

On the other hand, the sellers asserted that the purchasers had not submitted necessary documents to the F.H.A. in time for closing to occur June 14. The sellers also claimed, and the district court agreed, 527 F.Supp. at 608,

610, that purchasers had a duty to give sellers fifteen days notice of the date of closing, and if such notice had been given, the repairs would have been completed by June 14. The contract language in paragraph 14(b) that this court finding is based on, however, states: "*Place.* Settlement or closing hereunder shall be conducted by a person or firm designated by Purchaser, such designation to be by notice in writing given Seller not less than fifteen (15) days prior to closing hereunder." This provision merely requires that the agent to act for purchasers at closing be designated at least fifteen days before closing. An agent of DRG, Clyde Frame, admitted it was his responsibility to give the notice under this provision to the sellers. In May 1979 the agent had written contact with Joseph Baron, purchasers' attorney, concerning the closing, and so presumptively had knowledge of the closing agent's identity. Moreover, in light of our holding that the contract closings were effectively extended past June 14, 1979, no notice was required before the end of May 1979.

Because the deposit breach was totally waived by the sellers and because the closing date on the contracts was effectively extended by sellers' agent, the purchasers cannot be denied the benefits of these contracts on the ground that they were the first to violate its terms. We find that the sellers wrongfully repudiated these contracts on June 14 when they declared a default under paragraphs 14(a) and 14(b) of the contracts. The sellers' actions give the purchasers a claim for damages for total breach. Restatement (Second) of Contracts § 253(1) (1981).

■ The district court held, 527 F.Supp. at 610, that even if the contract date had been extended to July 16, 1979, the purchasers would still be precluded from recovery because they failed to appear for closing on June 29, 1979, the date for closing set by their own attorney, and failed to demand that the seller close prior to July 16 when the F.H.A. commitments would expire. We find, however, that the sellers' total repudiation relieved the purchasers of any further contract duties. A tender by one party is waived where the other party declares a repudiation of the contract or takes any position which would render tender a "vain and idle ceremony." *Miran Investment Co. v. Medical West Building Corp.*, 414 S.W.2d 297, 303–04 (Mo.1967); *see M.K. Metals, Inc. v. Container Recovery Corp.*, 645 F.2d 583, 588 (8th Cir.1981); Restatement (Second) of Contracts §§ 253(2), 255 (1981). Likewise, the effect of a repudiation is not changed if the other party to a contract urges the repudiator to retract his repudiation or to perform despite his repudiation. Restatement (Second) of Contracts § 257 (1981).

We thus reverse and remand this case for further findings in accord with this opinion.